**MUSSLEWHITE et al. v. GILLETTE.**

No. 6279.

Court of Civil Appeals of Texas. Amarillo.
Feb. 16, 1953.

Rehearing Denied March 23, 1953.

Crenshaw, Dupree & Milam, Lubbock (Max Addison, Lubbock, of counsel), and Allison & Allison, Levelland, for appellants.

Allen, Crampton, Johnson & Purcell, Wichita Falls, for appellee.

MARTIN, Justice.

Appellee, Demory Gillette, and wife Beatrice Gillette, while driving from Port Isabel, Texas, to Lubbock, Texas, a distance of approximately 700 miles, collided with a trailer owned by appellant, Paul Musslewhite, and operated by appellant, Lloyd M. Fuller. The trailer, pulled by a truck tractor, was struck while making a left-hand turn off the Big Spring Highway onto the Forsan farm to market road. Beatrice Gillette, 56 years of age, was driving the Chevrolet automobile and the approach to the scene of the accident for several miles was a straight, level highway. The automobile approached the place of collision at a speed in excess of 60 miles per hour and passed through an area on the highway where men were working as indicated by a warning sign placed near the edge of the highway. The tractor was off the highway and on the Forsan road and the trailer was on Mrs. Gillette's side of the road, but the left-hand side of the road was open. Mrs. Gillette did not apply the brakes on the automobile until within 20 or 30 feet of the trailer and drove the Chevrolet into the trailer at terrific speed. The collision demolished the Chevrolet automobile, killed Mrs. Gillette instantly and injured the appellee, Demory Gillette. Appellee filed suit for damages caused by the death of his wife, and for medical expenses, damage to his automobile, and for the damage he suffered from personal injuries. From a judgment in favor of appellee in the amount of $11,215.50, appellants perfected their appeal and present 15 points of error.

Appellants' point one asserts that the trial court erred in not sustaining appellants' motion to declare a mistrial because of the injection of the issue of insurance into the case by appellee's counsel on cross-examination of appellants' witness. "It is a well settled rule in this jurisdiction that it is error to inform the jury that the defendant in an action for damages for personal injuries is protected by indemnity insurance." Finck Cigar Co. v. Campbell, 134 Tex. 250, 133 S.W.2d 759, 761; Rojas v. Vuocolo, 142 Tex. 152, 177 S.W.2d 962. "But that rule has no application when the defendant, or one of his witnesses, voluntarily brings such information to the jury; and it is not brought through any fault of the plaintiff or his attorneys." Finck Cigar Co. v. Campbell, supra; Texas Textile Mills v. Gregory, 142 Tex. 308, 177 S.W.2d 938. Under these authorities, the sole issue here is whether appellee's introduction of the issue as to insurance in the cause is within the quoted exception. In examining the cause as to this issue the fundamental concept should be borne in mind that the attorneys for appellee were in possession of the knowledge and facts concerning the cause of action as known to their client, the appellee, and to the principal witnesses on whom they rely to establish their cause of action.

B. W. Hedgepeth, a disinterested witness, was placed on the stand by appellant. While Hedgepeth was on the witness stand, the attorneys for appellee in cross-examining such witness brought out the following testimony. This action was assigned as error by appellants' point one.

"Q. When was the first time anybody came out there and asked you about how fast you thought it was

going? A. I guess it must have been the Cop.

"Q. Sir? A. It must have been the Cop.

"Q. This red-headed fellow here? A. Yes sir.

"Q. What did you tell him? A. About 70 miles an hour.

"Q. All right, sir, then who was the next person that asked you how fast it was going? A. Well, it must have been the Insurance Adjuster.

"Q. I see."

Appellee in his brief, and also by oral argument made on appeal, contends that he was without fault in bringing out the above information as to insurance and sought to place the blame on Hedgepeth in the following manner: "He knew that two highway patrolmen investigated that accident; he knew that he talked with both highway patrolmen; he knew he told both of them that he did not see the accident."

First, it should be recognized that appellee's attorney had the legal right to impeach Hedgepeth. But if appellee sought to prove that Hedgepeth had talked to two patrolmen and thereafter intended to impeach him by showing the statements made by him to the two patrolmen, he could have asked Hedgepeth whether he talked to the two named patrolmen. On this issue an examination of the statement of facts reveals that one of the patrolmen testified that he talked to several people and "didn't get any names at all." If this were not enough, appellee's attorney further proved conclusively that it was not even the duty of this patrolman to get any names or leads as this work evolved wholly upon the other patrolmen present at the scene of the collision. A check of this second patrolman's testimony reveals that he did not take the names of witnesses nor did he procure a single statement from witnesses in the cause and present the same in court. The astuteness of this patrolman's coverage of the collision and identification of Hedgepeth, or any other witness in the cause, is revealed by his statement: "One particular person that I recall was a young boy, I believe he wore glasses. I

do not recall his name or anything of that nature." An examination of the three volume statement of facts as to this issue reveals little more than the evidence that the two patrolmen came to the scene of the collision and that such patrolmen were not in possession of sufficient knowledge of the facts at issue or of the identity of the witnesses present to impeach Hedgepeth or any other witness placed on the stand by appellants. In fact, the one patrolman appellee relied on for impeachment of appellants' witnesses, revealed on cross-examination that his entire knowledge and recollection of the various disinterested witnesses placed on the stand by appellant was derived solely from a briefing given him by appellee's attorney just before such patrolman went on the witness stand to testify.

An examination of the record reveals that Hedgepeth only talked to one patrolman at the most and therefore, appellee's attorney, with full knowledge of such fact, should have known "he was treading on dangerous ground" in asking the witness who was the next person who asked him about the speed of appellee's automobile. At least appellee should have been able to produce a written statement executed by Hedgepeth to at least one of the two patrolmen or should have had Hedgepeth positively identified as questioned by both patrolmen before engaging in the type of cross-examination quoted hereinabove.

A further examination of the record on the above issue reveals that appellee himself testified that he never made a statement to any person. Appellee also testified as to whether he talked to any officer, as follows: "A. I never talked to any law people." With this knowledge in his possession, appellee's attorney engaged in the following direct examination of the appellee:

"Q. Mr. Gillette, while you were in the hospital at Big Spring, did you ever give a statement in writing to any person that came in and talked to you? A. No, I did not."

This should have been sufficient, if not too much since the attorney surely knew

whether his client had made a statement, but such attorney engaged in the further direct examination of Mr. Gillette as follows:

"Q. Well, now, Mr. Gillette, do you remember people coming in and talking to you and they wrote something down? A. Yes.

"Q. All right now, do you remember in your own mind clearly now that you did not sign any of those statements? A. I did not sign any of them that I know of.

"Q. That you know of? A. No, I was pretty dopey in that hospital, but I don't think I signed any paper at all for anyone."

In addition to the two instances of interrogation by appellee's attorney, as shown in the paragraphs hereinabove, the record is replete with the same type of examination. The direct examination of one Fuller, by appellee's attorney, reveals the following:

"Q. Now, did you take any pictures of these scenes down there? A. No sir, I didn't.

"Q. Were you with anybody when anybody else took them? A. There was some people down there now, whether they were taking pictures I don't know.

"Q. Did you take anybody down there with you to take pictures? A. Mr. Mottlewell, myself and Charlie Young went down there.

"Q. All right, did you take anybody with you down there to take pictures? A. No sir."

In further examination of the same witness, appellee's attorney brought out the following:

"Q. Now all of this investigation you made of it, and these other representatives of Mr. Musslewhite, you made it the day after the accident?"

Appellee's cross-examination of one McDurman reveals the following:

"Q. Who's going to pay you, Mr. McDurman? A. Mr. Smith give me a card, told me to come by and—

"Q. Mr. Smith is a representative of the Musslewhite Trucking Company, I suppose, isn't he? A. I imagine he is, I hadn't never— "

Appellee's cross-examination of the witness Shaffer reveals the following:

"Q. Who asked you to come up here and testify in this case? A. This gentleman here.

"Q. When did you talk to him? A. He called me Thursday.

"Q. Did you ever talk to anybody else before? A. There was a fellow struck me in Water Valley, no, it was Sterling City.

"Q. Who was he? A. I don't know what his name was."

The witness Roberts was subjected to the following examination by appellee:

"Q. Well, somebody did talk to you then, didn't they? A. Yes.

"Q. Who was it that talked to you? A. Well, some fellow out of Midland.

"Q. Do you know what his name was? A. No, I don't, not right now.

"Q. Well, did he represent himself to be a representative of the Musslewhite Trucking Company? A. Well, yes, he said he was.

"Q. Nevertheless, one man representing Musslewhite Trucking Company came and talked to you and asked you to come up here, didn't they? A. Yes."

An examination of the record in this cause impels the opinion that Hedgepeth, a disinterested witness in the cause, did not voluntarily bring the information as to insurance to the jury, and it cannot be said from an examination of the record that such reference to insurance was made suddenly and inadvertently by the witness, and plaintiff's counsel was without fault in the matter. Further, as revealed by the jury findings hereinafter discussed, appellants were injured by the action of appellee's attorney in injecting the issue that appellants were insured.

The cases make no distinction as to whether the information as to insurance was brought before the jury by the de-

fendant or by the defendant's witnesses. But, a distinction should be made between the introduction of evidence of insurance by testimony of the defendant and introduction of such testimony through disinterested witnesses placed on the stand by defendant. It should be recognized that a defendant in a damage suit may gain an advantage by causing a mistrial, but it cannot be reasonably assumed that a disinterested witness, who is losing time from his business or work by appearing at the trial, would have any interest in causing a mistrial. However, aside from this distinction, error is shown in the case because of appellee's introduction of evidence that appellant was insured, and the case must be reversed. Texas Co. v. Betterton, 126 Tex. 359, 88 S.W.2d 1039; Huey & Philp Hardware Co. v. McNeil, Tex.Civ.App., 111 S.W.2d 1205, syl. 6; Texas Power & Light Co. v. Stone, Tex.Civ.App., 84 S.W.2d 738, syls. 4, 5, error refused; Finck Cigar Co. v. Campbell, supra; Texas Textile Mills v. Gregory, supra; Rojas v. Vuocolo, supra.

■ Appellants' point two does not reflect harmful error as it is not a material issue as to whether appellee and his wife left Port Isabel at 3:20 or 4:20 o'clock the morning of the collision. The calculation shown in the record as to average speed of the automobile based on such departure time, time of the collision, and the mileage traveled could not impair the testimony of the many eye-witnesses at the scene showing that appellee's car was being operated at the rate of approximately 70 miles per hour at the place of the collision. Further, considering all the towns passed through by the car, it is readily apparent that to average the asserted 43.23 miles per hour on the road appellee's automobile would have had to increase its rate of speed on the highway in order to compensate for time lost in passing through the various towns and cities. Permitting appellee to refresh his memory from a diary kept by his wife was error, but the same could not have harmed the appellant in the light of the conclusive testimony as to speed given by eye-witnesses to the accident and the resultant finding of the jury as to ex-

cessive speed. Rule 434 T.R.C.P. Appellants' point two is overruled.

■ Appellants' points 3, 4 and 5 will be discussed together as they assert that the jury's findings as to proximate cause under special issues 22, 25 and 28 were against the great weight and preponderance of the evidence. The jury found, upon competent evidence, that Mrs. Beatrice Gillette operated the Chevrolet automobile at a high and dangerous rate of speed. The jury also found that she operated the automobile at a speed in excess of 60 miles per hour at and immediately before the accident, and that Mrs. Gillette failed to keep a proper lookout. The jury also found that these acts and omission on the part of Mrs. Gillette constituted negligence. However, the jury further found under issues 22, 25 and 28 that such negligent acts and such omission were not the proximate cause of the collision and accident.

An examination of the record reveals that appellee's evidence in support of his cause is presented by the testimony of appellee and by two highway patrolmen. Neither of the highway patrolmen were present at the time of the collision nor did they even measure the length of the skid marks made by appellee's automobile at the place of collision. These patrolmen could not give the name of a single witness who talked to them nor did they produce a single statement taken from any witness. Appellants produced a number of disinterested witnesses whose testimony fully supports the findings of the jury that appellee's car approached the place of collision at a high and dangerous rate of speed in excess of 60 miles per hour, and that appellee's wife failed to keep a proper lookout. It is established by the great weight and preponderance of the evidence that Mrs. Gillette drove her car into the trailer at a high and dangerous rate of speed without observing the same until she was within approximately 30 feet of it, although the trailer was in plain view on a long straightaway highway approaching the same. The evidence is uncontroverted that the tires on the car skidded a distance of only some 20 or 30 feet before the automobile hit the trailer. The evidence of appel-

lee himself establishes that his wife failed to keep a lookout and also that she was driving at a high and dangerous rate of speed, and that said negligence was the proximate cause of the collision. On this issue appellee testified he was examining a map and heard his wife exclaim, "Oh, Oh," and looked up and only had time to duck his head before the automobile collided with the trailer.

An examination of the record clearly establishes, by disinterested witnesses, that the jury finding of proximate cause is so clearly against the great weight and preponderance of the evidence as to show passion and prejudice on the part of the jury as against the appellants. Appellants' points 3, 4 and 5 are sustained. Blakesley v. Kircher, Tex.Com.App., 41 S.W.2d 53; Lackey v. Gulf, C. & S. F. Ry. Co., Tex. Civ.App., 225 S.W.2d 630; Texas & N. O. R. Co. v. Stewart, Tex.Civ.App., 248 S.W. 2d 177; Texas Pacific Coal & Oil Co. v. Wells, Tex.Civ.App., 151 S.W.2d 927.

Points 6 and 7 are sustained in that the finding that Mrs. Gillette did not fail to have her car under proper control and that such was not the cause of the collision is against the great weight and preponderance of the evidence as shown by the same issues of fact discussed hereinabove.

In view of a retrial of the case, it is noted that special issue No. 4 is duplicitous, in that the jury may have found under the issue as submitted that Fuller suddenly turned the truck he was driving in front of plaintiff's automobile and yet such jury may have also found that plaintiff's automobile was at a place where she could miss the truck at such time. On a retrial of the cause, if the facts require a submission of such issues to a jury, the same should be submitted in a manner to permit the jury to answer separately the various elements involved.

The sustaining of appellants' points 1, 3, 4, 5, 6 and 7 requires that the cause be reversed and remanded, and rulings on other points of error are not essential to a disposition of the appeal. The judgment of the trial court is reversed and the cause is remanded for a new trial.