## LUBBOCK BUS CO. v. PEARSON.

### No. 6337.

Court of Civil Appeals of Texas. Amarillo.

Nov. 9, 1953.

Rehearing Denied Dec. 14, 1953.

Klett, Bean & Evans, Lubbock, for appellant.

Bob Huff, Lubbock, for appellee.

MARTIN, Justice.

Appellee, Houston Pearson, plaintiff below, recovered damages in the amount of $10,000 from appellant, Lubbock Bus Company, on the grounds that defendant's bus driver, while operating a bus with defective brakes, ran into the rear of plaintiff's Cadillac while stopped for a red traffic light in the city of Lubbock. The $10,000 in damages was based upon jury findings that plaintiff suffered personal injury in the sum of $7,500, probable future medical and hospital bills, $2,000, and $500 damage to his Cadillac. The damages for personal injury and hospital bills were based upon appellee's contention that he suffered same by reason of a rupture of the intervertebral disc between the fifth lumbar vertebra and the sacrum.

Appellant perfected an appeal from the judgment of the trial court and presents twelve points of error. Appellant's points 1, 2, 3, 4, and 5 assert that the following jury findings are without any evidence to support them, at any rate contrary to the overwhelming weight of the evidence, to wit:

1. That the bus driver was driving the bus with defective brakes.

2. That he was guilty of negligence in driving the bus with defective brakes.

3. That the bus driver knew or by the exercise of ordinary care should have known that the brakes were defective.

4. That the bus driver was guilty of negligence in driving the bus with defective brakes when he knew or he should have known that the brakes were defective.

5. That the alleged negligence of the bus driver in operating the bus with defective brakes was the proximate cause of the collision.

Without detailing the evidence outlined in the two-volume statement of facts, it is ruled that the evidence is sufficient to support the verdict of the jury and appellant's assignments of no evidence and insufficiency of the evidence are overruled. It is particularly worthy of note, in view of the disposition made of this appeal, that the testimony of appellant's bus driver was sufficient to support the jury verdict on the above issues.

Appellant's point 6 asserts that the trial court erred in overruling appellant's objection to the court's charge for "failure to define defective brakes", and in refusing to give the appellant's requested Special Issue 6 asking the jury whether appellant failed to have the bus equipped with brakes as specified by Article 6701d, Section 132(b) of the Statute, Vernon's Ann.Civ.St. This point of error is overruled as the statutory requirement does not exclude the common law duty of due care with reference to braking equipment. Bailey v. Walker, Tex.Civ.App., 163 S.W.2d 864; Airline Motor Coaches, Inc., v. Guidry, Tex.Civ.App., 241 S.W.2d 203; Volume 30, Texas Law Review, Page 778.

The trial court did not err in refusing to give appellant's requested special Issue No. 4 asking the jury whether the collision was the proximate result of an unavoidable accident as the evidence in the record does not require the submission of the issue of unavoidable accident. Appellant's point 7 is overruled.

Appellant's point 8 and point 9 will be discussed together as the same are interrelated under the fact issues. Point 8 alleges that the trial court erred in refusing to give defendant's Special Issue No. 5

asking the jury whether the plaintiff's fall, while getting out of bed to cut off an alarm clock, on June 11, 1952, was the sole proximate cause of the injuries complained of. Point 9 alleges that the court erred in overruling defendant's objection to the court's charge on proximate cause for failure to include the element of new and independent cause, and in refusing the defendant's timely requested definition of said term. These two points involve essentially the issue of whether there is evidence of probative force in the record supporting the issue that appellee's fall while getting up to cut off an alarm clock was a new and independent cause which proximately caused his injury as contrary to appellee's contention that such fall was merely occasioned by injuries suffered at the time appellant's bus collided with the rear of appellee's Cadillac in the city of Lubbock. North American Accident Ass'n v. Adams, Tex.Civ. App., 32 S.W.2d 525, Syl. 4.

The record is replete with evidence that appellee was not injured in the collision between the appellant's bus and appellee's Cadillac but such evidence need not be detailed here. The preponderance of the evidence in the record reveals that the bus merely "rolled" into the rear of the Cadillac at six or seven miles per hour at a time when it was coming to a stop. Under the evidence, the collision of the two vehicles did not create enough jolt or noise for the passengers on the bus to even hear or notice it. Appellee himself admitted that at the time of the collision he did not complain about any back injury although he did have his hat knocked off and was doubtful as to whether the shrimp pink paint on the Cadillac could be matched. An officer, called to the scene by appellant's driver, as well as passengers on the bus, testified that appellee stated he was not hurt at the time of the collision. Three physicians testified that appellee did not have a ruptured disc as contended by him and his physicians. These and other elements revealed in the statements of facts are important but the essential element to be searched for in the record is whether the evidence raises the issue that plaintiff's fall at his farm home

while getting up to cut off an alarm clock was the proximate cause of his injury or was a new and intervening cause of such injury rather than the collision between appellee's automobile and appellant's bus.

On the issue above outlined appellee's testimony reveals the following: "Well, I had the alarm clock set, and it went off, and I started to get up out of bed to turn it off, and just fell flat on my face, I was paralyzed, I just couldn't hardly move, had extreme pains in my back." It must be observed that appellee himself did not testify that at the time he started to get up, or got up, he was paralyzed and as a result of such paralysis fell flat on his face. It must be further recognized from appellee's own testimony that he does not detail in this record which came first—the fall on his face or the paralysis. If he fell on his face and was paralyzed as detailed in his statement then it is clear that there is evidence that his paralysis and the pains in his back could have been proximately caused by his fall while getting out of bed to cut off the alarm clock at 5:30 o'clock in the morning.

On the issue raised by points 8 and 9 it is further observed that appellee inserted into the record hearsay testimony that appellee's doctor, T. H. Holmes, called in from Ralls, Texas, came over and examined him and stated that in his belief, "there was some disc or some disorder in my back". It is further noteworthy that Dr. T. H. Holmes was not called as a witness to substantiate the statements attributed to him by hearsay testimony of the appellee. Further, appellee used Dr. Jack Estes, an expert medical witness from Abilene who had examined the appellee solely for the purpose of testifying as a witness in the case, and the following testimony of such witness defeats appellee's contention that his injury was solely and proximately caused by the collision. "Q. You don't know when Houston Pearson got an injury that caused this condition of his, do you? A. I don't know it, no, sir. * * * Q. All right, we'll get right down to farming, a man can—many things that a man can do in the way of lifting, pulling, or straining that would cause

this very same kind of injury? A. Yes, sir."

The testimony of appellee's other medical expert, Dr. D. D. Cross, who examined appellee during the course of the trial, will not be detailed but this witness does not testify that the appellee's fall at the time he got out of bed to turn off the alarm clock was either a symptom of or caused by the collision of appellant's bus with appellee's automobile fifteen days prior to the time appellee fell in his home. Nor does Dr. Cross or Dr. Estes, or any other witness, testify that appellee would suffer complete paralysis some fourteen days following the collision of the car and bus as a result of such collision and that such paralysis would be such as to cause the appellee to fall flat on his face. In fact, Dr. Cross on direct examination with reference to such an issue, in the light of the lapse of only fourteen days between the fall and the collision of the bus and automobile, gave the following revealing testimony: "Q. State whether or not, Doctor, that those things sometimes after an injury develop, and they don't reach their maximum crushing there for a period maybe of five or six months after it's happened? A. That's true, it has happened that way; I've seen cases where it did."

In all the expert testimony as to the symptoms and tests for determining whether appellee suffered a ruptured disc, it must be observed there is no evidence that one of such symptoms and tests revealing such a disc injury would be almost complete paralysis of the appellee some fifteen days after the collision of such a nature as to cause him to fall flat on his face and be unable to rise without help. On the issue as to causation and intervening cause, Dr. Cross's testimony on behalf of the appellee reveals the following: "Q. This final question, Doctor, is it true or not true that sometimes the slightest injuries or jars, or —what do I want to say—stretches of the body may bring about this thing, this injury to the disc. A. Yes, sir, you're exactly right, that happens frequently from insignificant injuries."

The record in this cause, even as to the evidence presented by appellee, when viewed under the applicable rules as to the same raises the issue that appellee got up to cut off the alarm clock at 5:30 in the morning and fell flat on his face and thereby suffered paralysis and pains in his back. The court should have submitted defendant's requested Special Issue No. 5 asking the jury whether the plaintiff's fall, while getting out of bed to cut off the alarm clock, on June 11, 1952, was the sole proximate cause of the injuries complained of by appellee. In any event, there should have been included in the court's charge on proximate cause a definition of new and independent cause as timely requested by appellant. Appellant's point 8 and point 9 are accordingly sustained. Young v. Massey, 128 Tex. 638, 101 S.W.2d 809; Dallas Railway & Terminal Co. v. Bailey, Tex.Sup., 250 S.W.2d 379; Southland Greyhound Lines, Inc., v. Cotten, 126 Tex. 596, 91 S.W.2d 326; City of Waco v. Teague, Tex.Civ.App., 168 S.W.2d 521; 65 C.J.S., Negligence, § 111, page 692, 2nd paragraph.

█ Both briefs in the cause contain considerable discussion as to whether there is any pleading of new and independent cause. Aside from the fact that no cases are cited showing that such issue must be pleaded defensively, it is observed that the evidence supporting this issue was not only introduced without objection but much of the evidence introduced by appellee himself supports such issue. Rule 67, Vernon's Texas Rules of Civil Procedure. Strong v. Garrett, 148 Tex. 265, 224 S.W.2d 471, Syl. 16.

█ Appellant's point 10 asserts that the jury finding that plaintiff sustained personal injuries in the sum of $7500 as the proximate result of defendant's negligence is without any evidence to support it or at any rate contrary to the overwhelming weight of the evidence. This point is overruled but under the express recognition that there should have been a proper submission of the issues as hereinabove outlined along with the issue as to the proximate cause of the damage. There is sufficient evidence to support a jury finding that the injuries sustained by appellee were a proximate result of the collision. There is also sufficient evidence in the record to support a jury finding that such injuries were not a proximate result of the collision in that such injuries were a proximate result of a fall appellee suffered in his home following the collision, a new and intervening cause.

█ Appellant's point 12 asserts that the court erred in permitting appellee to use Dr. Cross as a witness-in-chief after defendant had closed. This point is overruled, in that the evidence of Cross in a large measure is in the nature of rebuttal and in any event if an error occurred in permitting him to testify as a witness-in-chief after defendant had closed the same was harmless error.

█ Under point 11 appellant asserts that the trial court erred in refusing to declare a mistrial when appellee's counsel purposely injected in the trial before the jury testimony to the effect that the damage from the collision was covered by insurance. Appellee's attorney contends that he brought himself within the exception outlined in Finck Cigar Co. v. Campbell, 134 Tex. 250, 133 S.W.2d 759 in that he was wholly without fault in the matter. A discussion of the law on this issue is not required here as the same has been adequately summarized by this court in Musslewhite v. Gillette, Tex.Civ.App., 258 S.W.2d 104. Since the evidence discloses without controversy that the issue of insurance was brought squarely before the jury in the cause the sole inquiry here is whether the witness for defendant voluntarily brought such information to the jury and whether it was not brought through any fault of the plaintiff or his attorney.

Certain fundamental principles should be recognized in the inception of an inquiry into the above issue. The witness who was supposed to have injected or voluntarily brought such information to the jury was the bus driver for appellant company. In this connection it is again observed that his testimony is the most potent evidence in the

record in support of appellee's cause of action. Without detailing all of this driver's testimony, it must be observed that there is nothing in such testimony from which the conclusion may be drawn that such witness was of sufficient guile or cleverness to recognize that he had the ability to cause a mistrial in the case by voluntarily bringing information as to insurance before the jury. On the other hand, the record reveals that appellee's attorney is a man of experience in the field of trial practice and adroit in the development of fact issues before a jury. These are the two principals on this issue. Also, it must be recognized that in examining the record the statement of appellee's attorney in his brief must be borne in mind, "it looks like the witness was intending to *purposely inject* insurance in the case and that is exactly what the plaintiff had been *leaning over backward* to keep out". (Emphasis added.) It is also a fact of particular importance that appellee's attorney did not see fit to join this bus driver as a party to the suit and that such attorney knew that the bus company was protected by insurance under his own admission in the record. It is further noted from the record that appellee's attorney had already introduced in the record on direct examination without objection the testimony of this bus driver as follows: "Q. In other words, you knew that you were in the wrong, and that you ought to fix his car? Is that right? A. Well, yeah." This is the testimony which was rehashed by the appellee's attorney whereby he claims that the issue of insurance was injected by the bus driver without any fault on his part.

The above elements are detailed as they are material in weighing the issues as to whether the driver volunteered the information and as to whether appellee's attorney was without fault. The record reveals that this same bus driver had volunteered every type of information favorable to the appellee's cause which appellee's attorney could in any manner devise or conjure up by his questioning of such witness. Since such bus driver was not even a party to the suit and appellee's attorney knew that the bus company was protected by insurance, it was wholly an immaterial issue as to whether this bus driver believed that it was his duty to pay the appellee for the damage to his shrimp pink Cadillac. At least it is a conclusive fact that appellee's attorney could not recover judgment against the bus driver, even on his own admission of liability, without making him a party to the suit. It is further recognized that no individual will voluntarily place himself in the position of being liable absolutely for a large claim for damage.

With the above elements in the record, it is noted that appellee's attorney on direct examination developed the following testimony as to the supervisor of the bus company: "Q. Well, now, what I am getting at, Mr. Buck likewise wanted them to get it fixed up. A. Sure." By this testimony the bus driver established that the supervisor of the bus company, Mr. Buck, was willing to pay the damage to the Cadillac. This should have been enough to satisfy appellee's attorney. But appellee's attorney continued in the following manner:

"Q. And there is no question in your mind that you—it was your duty to fix his car up, was there? A. That's right." On proper objection by counsel for appellant, the opinion of the witness as to his duty was stricken out by the trial court. Appellee's attorney was still not satisfied but was determined to hold the bus driver liable even though he had not seen fit to make him a party to the suit. "Q. In other words, you knew that you were in the wrong, and that you ought to fix his car up; is that right? A. Well, yeah." It is recognized that the admission of the bus driver that he was in the wrong would be valuable evidence in fixing liability on the appellant bus company but even this became immaterial once the driver had testified that the company supervisor was willing to pay for the damage to the automobile. But, it is not even remotely discerned as to how this bus driver's admission that he ought to fix up the appellee's shrimp pink Cadillac could further appellee's

cause of action in view of the fact that appellee had not seen fit to join such driver as a party to the suit.

Another element must be recognized concerning the examination of the driver as to his liability to pay and its bearing on the issue of whether he volunteered the evidence as to insurance. The pounding of the issue of the driver's own personal liability into such driver by appellee's attorney could bring nothing to the driver but the thought that he should protect himself from such overwhelmingly threatened liability for appellee's claim for damage. Appellee's attorney, having fully developed the issue as to liability by having the driver place himself at fault and liable for the damage and the company as well, was not satisfied to let the issue rest there. In the closing phases of the trial appellee's attorney, on the theory that he was going to impeach the bus driver on such wholly immaterial matter as to the driver's personal liability for the damage, went back and began reexamining the driver on the issue of whether he said he ought to fix up appellee's shrimp pink automobile. After all such gruelling examination, it is apparent from the record that it began to dawn at last on the driver that appellee's attorney was going to place all the damage claim on him. But, such driver still held out against admitting that he knew the insurance company ought to pay instead of him.

Omitting the long buildup in front of the bus driver's evidence and the overruling of objections—all covering some two pages—the following situation was developed by appellee's attorney:

"A. To tell you the truth, the way you was walking around that day, I don't remember much; I don't remember very much.

"Q. Well, there wasn't any walking around to a simple question like this, whether I was standing on my head, if I said, 'In other words you knew that you were in the wrong and that you ought to fix his car up. Is that right?'—and your answer was 'Well, yeah', Now that was the testimony that you gave back there sitting in that very witness chair; isn't that right? A. I don't know for sure, Mr. Huff.

"Q. Do you say the court reporter here didn't transcribe your testimony? A. No, sir, I don't say that.

"Q. Well, what is your testimony now? Do you say that you said that over there in Kyle Ratesseau's (note—insurance adjustor) office or you don't say it. A. I don't believe that I said I was responsible for it and that I was supposed to pay for it because the insurance takes care of that.

"Q. The what? A. The insurance takes care of that." (Emphasis added.)

It is here ruled that this bus driver did not "voluntarily bring such information to the jury" but that it was brought through the fault of the appellee's attorney. Such ruling is required by this record even prior to appellee's attorney reemphasizing the issue of insurance but certainly such attorney's intention is clearly demonstrated by his final interrogation, "Q. The what? A. The insurance takes care of that."

The above should be a sufficient coverage of the record to reveal the correctness of the ruling made. But, the record has been reexamined on the issue of whether the cause was tried, particularly as to the examination of appellant's bus driver, on the entire theory of injecting insurance and prejudicial matters before the jury. Such evidence is material on the issue as to whether the driver or appellee's attorney injected insurance in the cause as it is not believed that where an attorney injects every specie of prejudice in the record that he could be "leaning over backward" and wholly without fault in haranguing the driver in an extended examination as to whether such driver ought to pay for the appellee's car damage. This is particularly true since such attorney had both the bus company and its insurer as parties liable for any damage claim as recovered.

Brief sketches will be given of the examination of the bus driver and such examination will merely cover prejudicial questions which were propounded to the witness without a single basis of fact in

the record for the same. "Q. He told you if you were guilty, to go on and tell them you were—to be a man." After considerable discussion there was a repetition of the question, "Q. Mr. Buck told you if you were guilty to be a man and—. A. Didn't nobody tell me. Q. * * * You have since learned that a fellow should have brakes on his bus if he is going to drive down here in this heavy traffic where there's thousands of people going." With reference to the hiring of the bus driver the following was asked:

"Q. Did he ask you whether you knew enough to not drive with defective brakes when he hired you? A. No. sir, he didn't ask me. He didn't even—he just said, 'I will put you to work, and start hauling these folks and making us a bunch of money.'

"Q. And you felt that because the old company had an old bus that had old defective brakes on it and you were required to use it and get out and haul passengers and make money for them, you felt like you were the one who owed the fine, is that right? A. No, sir, I still don't think I owed the fine.

"Q. You don't? You think that, say, if they were white people they would have paid it, isn't that right? A. (No answer.)

"Q. Every time you picked up a passenger, why that old bus company made more money, didn't they?

"Q. And did you say anything to your supervisor or any of those bosses about them paying that fine? A. Yes, sir.

"Q. And what did they say about paying it? A. He said he'd check into it * * *.

"Q. Well, how long is it going to take him to check into that and see if he is going to pay your fine? A. I don't know."

All the improper examination will not be detailed here but it is particularly noteworthy that appellee's attorney, with reference to the bus driver demonstrating that the brakes on the bus would not work, a material issue in the cause, started out on the theory that all the bus driver had to do was push a peddle like a foot feed to set the air brakes. Then such attorney apparently recognized that the air brakes would not operate unless the motor was running to build up the air pressure. Thereafter when he interrogated the witnesses with reference to this issue, he included in his questions the unproven fact that the bus driver got in and cranked up the motor and demonstrated the brakes. The record finally reveals by direct testimony that there is no evidence that the motor was ever started in demonstrating the brakes on the bus.

The driver was also subjected to interrogation on the following issues. The record reveals that the driver passed out cards to obtain the names of the parties in the bus at the time of the collision.

"Q. Yeah, in other words and you—and you attended to that matter before you got out to see if you had killed anybody, if you had hurt anybody that you had run over. Q. Your instructions were to stop and take all those passengers and take in those quarters. Is that right? Q. To ride the bus. Thank you. You don't let anybody ride that bus that don't put some money in that thing, do you? Q. All right, I have been standing here propounding questions and waving my hands and that and we are in front of the jury and a bunch of people; now, can you explain why that one time that you get scared and tell falsehoods, and other times you can tell the truth." The trial court sustained an objection to this interrogation.

Directly on the issue of injecting insurance it is noted that appellee's attorney seized every opportunity to bring in the name of Kyle Ratesseau, an insurance adjustor in that territory. In addition to injecting the name of insurance adjustors in the record, it is noted that in the examination of even a disinterested witness appellee's attorney did not overlook the opportunity to inject the issue of insurance and the apparent prosperity of insurance companies. In the cross-examination of Ben

Fields by appellee's attorney we find the following: "Q. All right, now, if I understand it, you walk a block down here to catch the bus, is that right? A. Yes, sir, I do. Q. And I guess you catch it over there in front of that big old four-story insurance building. A. Yes, sir, I do." We believe that these sketches from the evidence and others not detailed here are sufficient to reveal that appellee's attorney worked diligently at prejudicing the appellant in the presence of the jury. In repeatedly haranguing the bus driver, who was not even a party to the suit, as to his duty to pay for the plaintiff's damage he could but expect to finally put the driver on the defensive and the only logical answer that appellee's attorney could expect from the driver under his gruelling examination of such driver on the sole issue as to whether he ought to pay for the car damage was the answer given by the driver that he did not believe he was under the duty to fix appellee's car because the insurance company was supposed to fix it.

Before closing the above issue it must be further observed that this court, in the absence of an appeal, cannot know the number of cases in which a mistrial was declared in the trial court due to the defendant or its witnesses injecting insurance in the record. But, this court can take judicial knowledge that the cases brought before this court on appeal do not reflect that the acts of defendants or their witnesses in injecting insurance in suits for damage are so widespread and flagrant as to require an instruction from the trial court to the witnesses that they are not to inject the issue of insurance. This record lends itself to the conclusion that the request made by appellee's attorney that the court instruct defendant's witnesses not to mention insurance was merely anticipatory of the breach to come. It could do no more than point up the issue to the witnesses. This view is further enhanced by the statement made to the trial court by counsel while requesting such an instruction, "We want to call the court's attention to the fact that the law is

well settled on that point that if counsel is acting in good faith when the other party brings insurance into the case it certainly does not require a mistrial and that was exactly the reason that I am showing the court that we are certainly acting in good faith."

As hereinabove outlined, the issue as to whether the driver volunteered the matter of insurance and as to whether appellee's attorney is without fault must be judged on the entire record and it is evident that if the attorney for appellee was "leaning over backward" in the thought of keeping the record clear of any prejudicial matters, it is difficult to find the point where he started leaning over backward. This is particularly emphasized when it is noted that at the same time counsel requested an instruction that the defendant's witnesses be ordered not to mention insurance he was not willing to forego his use of various adjustors' names in the record. He was certainly not leaning over backward when he reemphasized the issue of insurance by reinterrogating the witness on the same by his question, "The what?"

Appellee's attorney has urged on this court the dire consequences that will follow an adverse ruling on his contention under the issue as to injecting insurance by the following language in his brief: "If this court rules that admission was invited it would be absolutely impossible to ever try a collision case and keep insurance from being mentioned." The risk is assumed and appellant's point 11 is sustained. Musslewhite v. Gillette, Tex.Civ.App., 258 S.W. 2d 104; Finck Cigar Co. v. Campbell, supra; Texas Company v. Betterton, 126 Tex. 359, 88 S.W.2d 1039; Huey & Philp Hardware Company v. McNeil, Tex.Civ. App., 111 S.W.2d 1205, Syl. 6; Texas Power and Light Company v. Stone, Tex.Civ. App., 84 S.W.2d 738, Syl. 4–5, error refused.

The judgment of the trial court is reversed and the cause is remanded.