**TEXAS PACIFIC COAL & OIL CO. et al.**
**v. WELLS et al.**
No. 2322.

Court of Civil Appeals of Texas. Waco.
May 15, 1941.

Rehearing Denied June 12, 1941.

Naman, Howell & Boswell, of Waco, for appellants.

Turner, Rodgers & Winn and Will R. Wilson, Jr., all of Dallas, and Bryan & Maxwell and Stansell Bryan, all of Waco, for appellees.

HALE, Justice.

Appellees instituted this suit against Texas Pacific Coal & Oil Company, J. H. Jackson and O. L. Fletcher for the recovery of damages on account of injuries resulting in the death of Charles S. Wells. The deceased was operating a 1937 Ford V-8 coupe going south over the Waco-Dallas highway at about 10:30 o'clock on the morning of February 9, 1937, and appellant Jackson, hereafter referred to as the truck driver, was operating a 1936 Chevrolet oil truck going north over said highway when the two vehicles came into violent collision near the east margin of the concrete portion of said highway, causing the instant death of the deceased, the destruction of his Ford automobile, serious injuries to the truck driver and substantial damage to the truck.

Upon the conclusion of the testimony, appellants seasonably requested the court to instruct the jury to return a verdict in their favor and, such motion having been refused, they interposed timely objections to the submission of each of the issues upon which their liability might be predicated on the ground that there was no evidence raising such issues. The jury found actionable negligence on the part of the truck driver in that he turned the truck on to his left (west) side of the highway just before the collision and failed to continue on across, but turned back on to and across the right (east) side of the highway. The jury also found against appellants on the issues of contributory negligence and discovered peril, which were duly raised by the pleadings. The court overruled the motion of appellants for judgment non ob-

stante veredicto and rendered judgment against them, from which they have appealed, and by appropriate assignments they insist that the judgment should be reversed and here rendered in their favor because there was no evidence to support the findings of the jury against them and because the undisputed evidence established contributory negligence as a matter of law.

■ The essential facts upon which a claim of negligence is based may not be presumed, but each component element necessary to support a recovery must be established by competent, admissible evidence. In passing upon the competency of the evidence to raise such an issue, it is the duty of the court to view the same and all reasonable inferences that may be drawn therefrom in the most favorable light for the claimant, and if there be any such evidence, either direct or circumstantial, which when thus viewed may serve as the basis for a legal inference of the fact sought to be established, then such issue, if otherwise material, should be submitted to the jury. On the other hand, if there be no evidence of probative force tending to establish the fact or facts upon which the charge of negligence is grounded, then the court should instruct the verdict. And further, in the language of the Supreme Court in the case of Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, 1063: "It is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence.'"

■ The primary negligence, if any, of the truck driver in this case is grounded upon the charge that he turned the truck on to his left (west) side of the highway just before the collision. There is no direct evidence from any witness that he did so, all of the same being to the contrary. But we must determine whether there was any evidence of probative force showing the existence of circumstances which, when viewed in the most favorable light for appellees, would justify the jury in reasonably inferring therefrom that the truck driver did turn said truck on to his left side of the highway just before the collision.

Appellees introduced in evidence a large map, drawn to scale by a licensed engineer, demonstrating the surface area and eleva-

tion of the section of the highway where the collision occurred. On the west side of the highway immediately opposite the point of collision was the Hilltop Filling Station. There was a slight curve in the highway at this point so that one approaching the scene from the north would begin a gentle turn to his left about 500 feet before reaching the filling station and at about the same distance south of the station this gradual curve disappeared into another straight-a-way. The elevation was such that one approaching the scene from the north would travel somewhat upgrade, gaining one foot in the last 300 feet traveled, and continuing south from the point of collision the elevation descends for a distance of 800 feet at an average grade of 1.7%, such grade being .8% in the first 100 feet, 1.5% in the second 100 feet, 2% in the third 100 feet, and so on to the low point, which at 800 feet away is 13.9 feet lower than the crest. There was a well defined black stripe extending north and south in the center of the highway. The width of the concrete portion of the highway was 20 feet, with 10 feet of smooth shoulder on each side of the concrete and a width of 100 feet for the entire right-of-way.

Appellees also introduced in evidence 18 photographs taken at the site of the collision at different times. Five of these pictures were taken by A. H. Caperton within five minutes after the crash. They show the Ford completely demolished and entirely off of the concrete portion of the highway to the east thereof, and the truck with its left rear wheel still on the pavement, the front of the truck being east of the concrete, with the oil tank careened on its left side, the right rear wheel of the truck being suspended in the air, its axle forming an angle of about forty-five degrees with the surface of the highway. Caperton testified that the right rear wheel of the truck was still spinning when he took the first of these pictures. It is not contended that any of the Caperton pictures disclose any skid-marks on the highway. Additional pictures were taken by one Urbanowsky at the request of appellant Fletcher within two or three hours after the collision, and others were taken by Wayne Farmer at the request of appellee Taggart four or five days later. There was no direct testimony as to whether the physical facts reflected by any of these additional pictures were the same as obtained

immediately after the collision, and counsel for appellants seasonably objected to their introduction in evidence on that ground. Appellees contend that some of these pictures indicate skid-marks on the concrete portion of the highway which were made by each of the vehicles involved in the wreck. The marks so made by the Ford begin on the west side of the center line and extend in a curve on to the east side of the concrete .portion of the highway. Appellees assert that these pictures also demonstrate certain curving marks made by the truck, but it appears, and we believe it is conceded by appellees, that all visible marks which could have been made by the truck were curving toward the east and all of such marks were entirely east of the center line of the highway.

Ed Mashek testified that he was driving north on the highway at the time of the accident; that he had passed over the bridge and was going up the hill when "*it seemed to me like* the truck was going to pull into the filling station, the best I could see of it, and he started in an angle to go to the filling station, and at the same time the V-8—the truck ran on to the right hand side of the road almost off the pavement— the truck was *going to go* across—*it seemed to me like* he was *going to go* into the filling station and then turned to the right and that is when the collision occurred, right on the right hand side of the road." The witness placed on the scaled map in evidence the point where he thought he saw the truck make a move as though it were going to turn into the filling station, which point was approximately 200 feet south from the point of collision. He testified that he was traveling at 45 or 50 miles per hour, but that the truck was not traveling more than 25 or 30 miles per hour. He did not testify that the truck or any part of it ever passed over the center line, and when he was asked specifically on cross-examination if he could testify that the truck passed over with one wheel or even touched the black line in the middle of the highway, he stated, unequivocably, that he could not; and he repeated several times that he could not say that any part of the truck ever went on to its left side of the highway. He testified that after the truck made the bobble it kept on its right hand side and started turning off of the pavement and the collision occurred on the right (east) side just off the pavement. There was some question as to whether the truck which the witness said he saw make a move as though it were going to go into the filling station was the truck involved in the collision, or another one traveling in the same direction immediately behind the truck that was actually in the collision. He also testified that it was his intention to drive into the filling station and stop there.

■ We are of the opinion that the evidence in this case was and is wholly incompetent as a matter of law to form the basis for a legal inference that the truck driver turned the truck on to his left side of the highway just before the collision. The nearest approach to any evidence in support of the issue is the testimony of the witness, Mashek, and if his testimony be regarded as any possible ground for an inference of that fact, then we think the same is so slight and its probative force is so weak as to amount to nothing more than a mere surmise or suspicion that the truck driver might have done so. Carlisle v. City of Waco, Tex.Civ.App., 56 S.W.2d 208; Huntley v. Psimenos, Tex.Civ.App., 67 S.W.2d 350; Wichita Valley Ry. Co. v. Fite, Tex.Civ.App., 78 S.W.2d 714; Caliandro v. Texas & P. Ry. Co., Tex.Civ.App., 103 S.W.2d 439; Paris & M. P. Ry. Co. v. Russell, Tex.Civ.App., 104 S.W.2d 650.

■ Appellees insist that, in the absence of evidence to the contrary, the presumption arises that the deceased was exercising ordinary care for his own safety prior to the time of his injury and consequently there must have been some reason why he suddenly turned his Ford car across to the east side of the highway; that such reason must have been the sudden discovery of a motor vehicle approaching him at the brow of the hill on its wrong side of the road; that if there was an approaching motor vehicle on its wrong side of the highway, the same must have been the truck with which the deceased collided. Even though the original presumption be indulged, the law does not permit the pyramiding of one assumption upon another because an ultimate fact thus arrived at is too conjectural and speculative to support a judgment. See Community Natural Gas Co. v. Henley, Tex.Com.App., 24 S.W.2d 10, and cases there cited; also: International Travelers' Ass'n v. Bettis, 120 Tex. 67, 35 S.W.2d 1040; Green v. Texas & P. Ry. Co., 125 Tex. 168, 81 S.W.2d 669.

It is also asserted that the Urbanowsky and Farmer pictures are admissible in evi-.

dence and that in the absence of any showing of a change in the physical facts thereby demonstrated, the jury was warranted in assuming that certain marks indicated in these pictures were made by the truck; that the position and direction of the marks thus made by the truck were such as to support an inference that the truck, before making such markings, could have been on the west side of the center line of the highway. We may concede, without deciding, the correctness of the original premise, but here again we are confronted with a conclusion arrived at by basing one inference upon another in violation of well established rules relating to the competency and probative force of evidence.

■ Furthermore, presumptions can not be indulged as a basis for legal inferences contrary to facts established conclusively by positive, direct evidence. Geffert v. Yorktown Ind. School, Tex.Com.App., 290 S.W. 1083; Town of Refugio v. Strauch, Tex.Com.App., 29 S.W.2d 1041; Galveston, H. & S. A. Ry. Co. v. Brewer, Tex.Civ. App., 4 S.W.2d 320, error refused; Sterling Nat. Bank & Trust Co. v. Ellis, Tex.Civ. App., 75 S.W.2d 716; Crabb v. Zanes Freight Agency, Tex.Civ.App., 123 S.W.2d 752. In this connection we will point out briefly some of the undisputed direct testimony of disinterested witnesses in this case.

W. L. Clary testified that he was traveling south on said highway at a speed between 60 and 70 miles per hour when he was at a point about five or six hundred yards north of the scene of the collision, at which point the deceased passed him traveling at a rate of speed "in the neighborhood of 75 miles per hour", because the deceased passed him on the highway "very rapidly"; that a high wind was blowing at that time and "as you hit a rise coming out of the hollow, you would catch it whipping your car over"; that "after this Ford passed me, he righted all right; he got out in front of me on his side of the highway; and, oh, within sight of the filling station, I saw the truck, I would say, 300 yards, or 400 yards, from the filling station; and after he righted himself, the Ford veered to the left just before getting to the station and the truck driver pulled off to the right immediately after." He testified that he was watching the truck and Ford sufficiently that if the truck had made a move he would have seen it; that the truck was traveling at 25 or 30 miles per hour and was on its right hand side of the highway; that the first change of course or of direction that the truck made was to the truck driver's right and that the truck driver pulled to his right immediately after the Ford had changed its course over to the east side of the highway and that the vehicles collided at the east edge of the highway, partly on the shoulder.

A. H. Caperton testified that he was traveling south along the highway when the Ford V-8 passed him some four or five miles north of the collision, at which time the witness was traveling between 55 and 60 miles per hour; that when the deceased passed him, he noticed the antenna of the radio on the Ford car was bent backward; that he continued to drive south and the deceased had gained a distance on him of about seven-tenths of a mile up to the time of the collision; that he saw the Ford car and truck "flying off of the highway, as it were"; that immediately upon arriving at the scene he took one photograph while stopping his car and then extricated the deceased from the wreckage, finding "apparently every bone in his body broken."

■ The positive testimony thus given by the witnesses Clary and Caperton, which is corroborated by all of the physical facts and circumstances in evidence, conclusively destroys any presumption which might have otherwise arisen that the deceased was exercising ordinary care for his own safety at and immediately prior to the collision. Reasonable minds may differ on some of the hypotheses suggested by the evidence as to why he suddenly turned or permitted his car to turn to his left across the highway, but there can be no doubt that his speed was a primary cause of the emergency in which he was acting at the time of the crash. The condition of his broken body, of his crumpled automobile, of the skid-marks made by his car which his son-in-law, Taggart, testified "looked like a tire skidding with the brakes on—in other words, they were ground into the pavement, looked like burned rubber," all showed unmistakably the terrific speed at which he must have been traveling when he plunged across the highway in front of the oncoming truck, so that reasonable minds may not differ in the conclusion that such excessive speed proximately contributed to cause the unfortunate consequences complained of. The only excuse which the evidence suggests that could relieve him from the results of his negligent

conduct in suddenly turning on to his left side of the highway is the fact that he was then acting in an emergency. But the existence of such emergency was in any event contributed to by his antecedent continuing negligence in operating his automobile at a rate of speed in violation of the statutes. The truck driver was not required under the law to anticipate such a combination of illegal acts on the part of the deceased and consequently we fail to see how his primary negligence, if any, could have been a proximate cause of the collision. In our opinion, however, the actionable negligence, if any, of the truck driver becomes immaterial because the deceased was himself guilty of contributory negligence as a matter of law. Schawe v. Leyendecker, Tex.Civ.App., 269 S.W. 864; Reilly v. Buster, Tex.Civ.App., 52 S.W.2d 521, points 13 and 14; Id., 125 Tex. 323, 82 S.W.2d 931; Koock v. Goodnight, Tex. Civ.App., 71 S.W.2d 927; Burton v. Billingsly, Tex.Civ.App., 129 S.W.2d 439, error refused.

We do not think the doctrine of discovered peril has any proper application to the facts of this case. Ordinarily the purpose and effect of a finding on discovered peril is not to impose legal liability on a tort feasor, but is rather to prevent such wrongdoer from escaping liability for the consequences of his primary negligence, even though the injured party be guilty of contributory negligence. As said by the Commission of Appeals in the case of Terry v. English, 130 Tex. 632, 112 S.W.2d 446, 449: "To permit this judgment to stand upon the theory of discovered peril would in effect be to hold that in most all negligence cases it is unnecessary to submit specific acts of negligence, but only to submit the general issue of discovered peril. That doctrine cannot be made to serve so broad a purpose."

But a finding of discovered peril which is without any support in the evidence can have no effect for any purpose whatsoever. The truck driver testified that "there was a car coming meeting me, and there was a car came around it, and when it came around this car, well, I took to the edge of the road, just right off the highway, and that is—when he hit me, that is the last thing I remember. I remember him when he came around this car, he tried to go back to the right side of the road and when he did that his car careened and he straightened it up and when he straightened it up, he just drove right into me." He further testified without dispute that he had never stopped at Hilltop Filling Station and had no intention of doing so on this occasion. We can find no competent evidence in this record showing, or in any wise tending to show, what, if anything, the truck driver, in the exercise of ordinary care, could have done with safety to himself, while acting in the very brief lapse of time transpiring after his discovery of the emergency, which would or could have averted the disaster. San Antonio & A. P. Ry. Co. v. McMillan, 100 Tex. 562, 102 S.W. 103; Gersdorf-Sloan Ambulance Service v. Kenty, Tex.Civ.App., 75 S.W.2d 903, error dismissed; Cantu v. South Texas Transportation Co., Tex.Civ.App., 110 S.W. 2d 995; Schumacher v. Missouri Pacific Transportation Co., Tex.Civ.App., 116 S.W. 2d 1136; Surkey v. Smith, Tex.Civ.App., 136 S.W.2d 893, error refused.

And finally, appellees insist that this court does not have jurisdiction to remand this cause for another trial on account of the insufficiency of the evidence to sustain the verdict because no assignment is here presented on that ground. We do not find it necessary to pass upon that question, however, or upon any of the additional assignments of appellants, because we are of the opinion that there was no evidence in contemplation of law raising the issues of primary negligence or of discovered peril and, since the undisputed evidence also established contributory negligence as a matter of law, we conclude that the trial court should have instructed the verdict.

We therefore have no alternative in the discharge of the grave responsibility which the law imposes upon us. Under the record, we are constrained to reverse the judgment of the trial court and here render judgment that appellees take nothing herein, which is accordingly done.