### KENT et al. v. STODDARD.

No. 2476.

Court of Civil Appeals of Texas. Waco.

Jan. 7, 1943.

Rehearing Denied Feb. 4, 1943.

Strasburger, Price, Holland, Kelton & Miller, of Dallas, and John Sayles and A. K. Doss, both of Abilene, for appellants.

Julian B. Mastin and Carl Wade, both of Dallas, for appellee.

HALE, Justice.

Appellants, Mrs. N. E. Kent and Ward Preston, sued appellee, J. B. Stoddard, to recover damages resulting from the termination in bad faith of a drilling contract. The case was tried before a jury. Upon the conclusion of all the testimony, appellee seasonably presented his motion for a peremptory instruction which was refused. Thereupon the court submitted two special issues to the jury inquiring: (1) Whether the act of appellee in terminating the contract constituted bad faith on his part under the facts and circumstances existing at the time thereof, and if so, (2) the amount of lost net profits sustained by appellants as a result of such termination. The jury was unable to agree upon a verdict. Thereafter the court rendered judgment that appellants take nothing, upon the express finding that there was no evidence in the case showing any conduct on the part of appellee which would constitute bad faith in any of his dealings with appellants.

Appellee owned two separate oil and gas leases covering 160 acres of land in Scurry County known as the Holcomb lease, or North 80 acres, and the McClure lease, or South 80 acres, respectively. He caused a well to be drilled in the Southeast corner of the McClure lease, which came in during the month of July, 1939, with an estimated potential production of 139 barrels of oil per day. In order to further explore said leases, and to develop the same if justified by such explorations, he entered into an extensive written contract with appellants by the terms of which he engaged them to drill "a well or wells for oil and/or gas," on said properties. The contract provided, among other things, as follows: "It is the intent to prosecute continuous drilling of eleven wells, with the probabil-

ity that there will be a total of fifteen wells drilled on the above described tract. The number of wells that will be drilled will depend entirely upon the recovery, which will be determined upon the completion of each well, and party of the first part (appellee) will be the sole judge as to whether or not the production obtained will warrant the drilling of any additional wells. * * * The first party shall have the right to authorize the abandonment or completion of said wells at any depth, or in any stratum, and second party shall immediately upon receipt of instructions from first party discontinue work on said wells, abandoning or completing the same at such depth as first party may instruct."

Shortly after signing the contract on September 29, 1939, appellants began drilling the McClure lease with two sets of equipment. They completed their first well on November 22 and their second well on November 24. On December 15, 1939, appellee wrote appellants as follows: "Due to the very rapid decline in production on the Scurry County leases, we have decided to limit our investment in this area to the South 80 acres, only. Consequently we will drill a total of eight wells. We have been successful in consummating a sale of the North 80 acres to the Mudge Oil Company, who are our neighbors to the North. In view of this fact, think it advisable to notify you at this time of our intention so you may make your arrangements for other work well in advance." At that time appellants were drilling on their third and fourth wells and had received instructions as to the location for their fifth and sixth wells. They continued drilling operations under the contract until in March, 1940, when they had completed seven wells, all located on the McClure lease, or South 80 acres, and for which services they were compensated in accordance with the terms of the contract.

Appellants alleged as grounds for their asserted action that appellee was required under the terms of the contract to act in good faith in determining whether the recovery of oil would warrant the drilling of additional wells, that appellee never exercised in good faith his judgment that the recovery of oil would not warrant the drilling of any additional wells in accordance with the requirements of the contract, but that he acted in bad faith in selling the lease on the Holcomb tract and in arbitrarily attempting to terminate the contract with appellants after drilling out the McClure lease, to their damage in the sum of $16,662.80 by reason of lost profits on the eight wells they were not permitted to drill on the Holcomb lease.

■■ Appellants here contend that appellee did not have the right under the contract in evidence to act arbitrarily and dishonestly in terminating or attempting to terminate the same. Such contention seems to be clearly sustained by the holding in the case of Cowden v. Broderick & Calvert, 131 Tex. 434, 114 S.W.2d 1166, 117 A. L.R. 61; and the authorities there cited. However, we think it is also clear from the contract as a whole, from the circumstances attendant upon its negotiation and execution, and particularly from the quoted provisions thereof, that it was the intention of the parties to vest in appellee the right to terminate the same if in good faith he concluded that the oil production obtained from such wells as might be drilled did not warrant the drilling of additional wells. Moreover, the burden was upon appellants to allege and prove that the act of appellee in so terminating said contract resulted from dishonest motives on his part. Therefore, the sole question upon which this appeal must turn is whether there was any evidence of bad faith on the part of appellee in the transaction complained of.

■ Appellants insist that the conduct of appellee in permitting them to drill out the McClure lease, and his conduct in selling the Holcomb lease, each and both constituted some evidence of bad faith on his part in terminating the drilling contract, so as to make out at least a prima facie case in their behalf. We realize that bad faith can seldom be proved by direct evidence. In most cases it must necessarily be inferred, if at all, from the proof of circumstances. We are also aware of the duty which rests upon this court to view all reasonable inferences and deductions that may be drawn from the evidence in the most favorable light from the standpoint of appellants. It may be that the conduct complained of, if wholly unexplained, or if explained solely by the verbal testimony of appellee, or if explained in a contradictory or uncertain manner, might supply the basis for an inference of bad faith.

■■ Appellants further insist that the evidence offered by appellee in explanation of his conduct in drilling the McClure lease

and in selling the Holcomb lease was not binding on the jury so as to conclusively overcome the presumption that might otherwise arise from such conduct. We cannot agree with this contention. Presumptions cannot be indulged as the basis for legal inferences contrary to facts established conclusively by positive, direct evidence. Texas Pacific Coal & Oil Co. v. Wells, Tex.Civ. App., 151 S.W.2d 927, point 8, and authorities cited. "Evidence which, uncontradicted and unexplained, would be prima facie evidence of a fact becomes insufficient to raise an issue of fact when the other facts in evidence conclusively prove that the fact sought to be shown by the prima facie evidence or presumption of fact does not exist." See Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 114 S.W.2d 226, 136 S. W.2d 207, 209, and authorities cited.

Appellee testified without dispute that the first well drilled in the Southeast corner of the McClure lease came in during the month of July in 1939; that he then thought the well was good for a sustained production of more than 100 barrels per day; that under the regulations of the Railroad Commission he was allowed to produce only 35 barrels per day from said well; that he immediately endeavored to secure special permission to increase his actual production in order to test actual performance in the field; that he finally secured permission from the Railroad Commission on October 11, 1939, to increase his allowable production to 112 barrels per day; that he then began to produce on that schedule and "within a period of a very few days it was quite apparent that we couldn't produce that oil. * * * Where we thought we had wells that would produce a hundred or more barrels per day, it was nothing but flush production that soon petered out. * * * Falling so far short in our ability to do this, taking into consideration the fact that new wells had been put on production, which gave us advantage of new flush production, it was quite apparent to me that the investment wouldn't be a paying one." Appellee further testified in detail to facts showing a rapid decline in the actual recoveries had from the wells drilled on the McClure lease; that he concluded therefrom in good faith prior to December 15, 1939, that the production obtained from said wells would not warrant the drilling of the Holcomb lease; that a part of the consideration for the sale of the Holcomb lease was to be paid in oil which might be recovered from said lease; that by drilling out the McClure lease he would thereby force Mudge Oil Company to put down at their expense offset wells on the Holcomb lease; and that his decision to sell off the Holcomb lease and drill out the McClure lease was prompted solely by his desire to reduce his losses on the transaction to the minimum.

Certified copies of proration schedules taken from the original files of the Oil and Gas Division of the Railroad Commission of Texas corroborated the testimony of appellee concerning the daily allowable production from the wells involved. The experience of appellee with the production actually obtained was corroborated by his books, records and by the undisputed testimony of his bookkeeper, whose duty it was to keep such books and records. The recorded instrument evidencing the sale of the Holcomb lease showed the consideration which appellee was to receive for the sale. It was shown that the reasonable expense incident to developing the eight wells on the McClure lease amounted to considerably more than $100,000 and that the expense of developing eight wells on the Holcomb lease would have been approximately the same.

M. N. Garrett, a consulting geologist and appraisal engineer of wide experience, testified without dispute to the total maximum amount of production which could be reasonably expected from the Holcomb and McClure leases. The substance of his testimony was that appellee would sustain a net loss of approximately $75,000 on the basis of the current price of oil as the result of having developed the McClure lease, and that his loss in drilling the Holcomb lease would have been substantially the same.

We do not think the trial court or the jury was authorized to ignore the explanation thus offered by appellee and his witnesses as to the motives which prompted him in disposing of the Holcomb lease and in drilling out the McClure lease. When his conduct in so doing was fully explained by his experience in the recoveries had from the wells drilled, when such explanation was clear and consistent with honest motives and the exercise of a sound discretion, when such experience was established by books, records and by the testimony of his bookkeeper, and when the wisdom and good faith of his actions was accounted for by the undisputed findings

and opinions of an expert appraisal engineer, such conduct lost the probative force, if any, which it otherwise might have had as the foundation for an unfavorable inference against him. Empire Gas & Fuel Co. v. Muegge, 135 Tex. 520, 143 S.W.2d 763; Willow Hole Independent School Dist. v. Smith, Tex.Civ.App., 123 S.W.2d 708, error refused; Great Southern Life Ins. Co. v. Dorough, Tex.Civ.App., 100 S. W.2d 772.

In our opinion, there was in legal contemplation no evidence that the act of appellee in terminating the contract sued upon constituted bad faith on his part under the undisputed facts and circumstances existing at the time thereof. It appears that all available evidence was fully developed. Consequently, all of appellants' assignments are overruled and the judgment of the trial court is affirmed.