Marcus GUTIERREZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 58125.

Court of Criminal Appeals of Texas, Panel No. 1.

Dec. 17, 1980.

Rehearing Denied Feb. 10, 1982.

Second Motion for Rehearing Denied March 10, 1982.

**58**

James A. Rindfuss, Kim I. Manning, on appeal only, San Antonio, for appellant.

Bill M. White, Dist. Atty., & Keith W. Burris, Lawrence R. Linnartz & H. Wayne Campbell, Asst. Dist. Atty., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J. and DOUGLAS and W. C. DAVIS, JJ.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for the offense of possession of heroin. The punishment, enhanced by a prior conviction, is imprisonment for fifty years.

The appellant, in his first ground of error, contends that the evidence presented at trial is insufficient to support his conviction for the offense of possession of heroin.

The evidence at trial reflects that on January 19, 1977, Officer Montemayor and his partner, Officer Garza, after receiving a phone call, established surveillance at Jack's Ice House. The officers were in separate vehicles and both officers characterized Jack's Ice House as a known drug connection. The officers were expecting to see a maroon 1967 Pontiac LeMans. They had been told by an informant that an Anglo couple and a Mexican couple from Austin were going to buy heroin at Jack's Ice House. An automobile fitting the description was seen stopping at a Pizza Hut located near Jack's Ice House. The car was occupied by a Mexican male and female and an Anglo male and female. The automobile was registered in Austin to one of the females. The appellant was identified as the driver of the vehicle. All four went into the Pizza Hut. After about 15 minutes, the two males left in the LeMans and the officers did not follow them. The two males returned fifteen to twenty minutes later. The two males went inside the Pizza Hut and then after ten to fifteen minutes, they all left.

The police followed the LeMans to Jim's Hamburgers. The driver got out of the automobile and walked back and forth in front of the telephone booth. He then went inside the booth. None of the four people under surveillance purchased anything from Jim's Hamburgers, although one of the females used the restroom. Another twenty to thirty minutes had passed when a maroon Chevrolet pulled up beside the LeMans. The driver of the Chevrolet was Henry Lopez, whom the police described as

a dope dealer. The appellant got into the passenger side of the Chevrolet. He remained inside the Chevrolet briefly and then returned to the LeMans. Officer Montemayor testified that he did not see anything exchanged between Lopez and the appellant. Both vehicles then departed. Officer Montemayor followed Lopez and later saw Lopez counting a large sum of money. Officer Montemayor stated that he was informed by an informant that a drug transaction had been completed.

Officer Garza, along with other police, followed the appellant and later stopped the appellant. As the police rushed the automobile, a small package was dropped out the window by the passenger sitting in the right rear seat of the vehicle. The package was later determined to contain heroin. A search of the vehicle and of all the passengers revealed no other contraband.

Lopez was called to testify by the State. He denied selling heroin to the appellant. The State then claimed surprise and impeached Lopez by introducing in evidence his testimony given at a hearing on appellant's motion to suppress evidence. At the hearing, Lopez testified that he sold heroin to the appellant. At the trial, Lopez denied selling the heroin, stating that he told the earlier version because he was in withdrawal and because of police pressure. The trial court instructed the jury that they could only use Lopez's testimony at the hearing for impeachment purposes. The appellant did not present any evidence.

In order for the offense of possession of heroin to be proven, the evidence must show that the accused exercised care, control, and management over the drug and that the accused knew that the drug was contraband. *Morr v. State*, 587 S.W.2d 711 (Tex.Cr.App.1979). The evidence need not establish that the accused was in exclusive control of the drug; evidence of joint possession is sufficient. *Norman v. State*, 588 S.W.2d 340 (Tex.Cr.App.1979). Also, proof of possession may be shown by circumstantial evidence if the circumstances exclude every other reasonable hypothesis except that of the guilt of the accused. However,

a finding of joint possession cannot be based solely on proof of mere presence at the place where contraband is found. *Heltcel v. State*, 583 S.W.2d 791 (Tex.Cr.App. 1979). There must be an affirmative link between the accused and the drug in such a manner, and to such an extent, that a reasonable inference may arise that the accused knew of the drug's existence and its whereabouts. *Hineline v. State*, 502 S.W.2d 703 (Tex.Cr.App.1973). This link can be established by additional independent facts and circumstances which indicate the accused's knowledge of the drug as well as control over it. *Powell v. State*, 502 S.W.2d 705 (Tex.Cr.App.1973).

In the case at bar, reviewing the evidence in a light most favorable to the verdict, we conclude that the necessary affirmative link was established. The evidence reflects that the police were on the lookout for a specifically described automobile and that the appellant was driving a vehicle fitting that description. Appellant's course of action through the entire time he was observed by the police was unusual and suspicious. The appellant met with a known drug dealer, Lopez, for a very brief time. Lopez was seen counting a large sum of money shortly thereafter; Lopez's denial of selling heroin to the appellant was impeached. Finally, heroin was dropped to the pavement from the automobile appellant was driving. These independent and additional facts and circumstances, when viewed in their totality, indicate the appellant's knowledge and control of the heroin. The jury could reasonably infer that the accused knew of the drug's existence and its whereabouts. See *Norman v. State*, 588 S.W.2d 340 (Tex.Cr.App.1979); *Long v. State*, 532 S.W.2d 591 (Tex.Cr.App.1975); *Lewis v. State*, 502 S.W.2d 699 (Tex.Cr.App.1973); *Hineline v. State*, supra; *Powell v. State*, supra. Appellant's first ground of error is overruled.

The appellant in his second ground of error contends that the trial court improperly instructed the jury during the punishment phase of the trial. The appellant's conviction was enhanced by a single prior felony conviction. The trial court instruct-

ed the jury that if it found all of the allegations set out in the second paragraph of the indictment to be true, it should assess punishment as a first-degree felony. The jury imposed punishment at imprisonment for fifty years.

■ The offense of possession of heroin is a second-degree felony. Art. 4476–15, Secs. 4.02, 4.04. V.A.C.S. Convictions obtained under the Controlled Substances Act may be enhanced under the Texas Penal Code. *Young v. State*, 552 S.W.2d 441 (Tex.Cr.App.1977). The Texas Penal Code in Sec. 12.42, provides in part as follows:

"(a) If it be shown on the trial of a third degree felony the defendant has once before been convicted of any felony, on conviction, he shall be punished for a second-degree felony.

(b) If it be shown on the trial of a second degree felony that the defendant has been once before convicted of any felony, on conviction he shall be punished for a first-degree felony."

Thus, it would appear that the State correctly enhanced the appellant's second-degree felony conviction under the Controlled Substances Act to a first-degree felony under V.T.C.A. Penal Code, Sec. 12.42(b). However, the appellant argues that the language of V.T.C.A. Penal Code, Sec. 12.41 controls. That section provides, in part, as follows:

"For purposes of this subchapter, any conviction not obtained from a prosecution under this code shall be classified as follows:

(1) 'felony of the third degree' if confinement in a penitentiary is affixed to the offense as a possible punishment;"

The appellant contends that his conviction was obtained under the Controlled Substances Act, and a prosecution outside the Texas Penal Code. Therefore, he argues his conviction, to be enhanced, must be considered a third-degree felony. Thus, the third degree felony would be enhanced to a second-degree felony and not a first degree felony.

■ We do not agree with appellant's interpretation of this provision. Section 12.41 applies only to Subchapter D concerning exceptional sentences. Thus, when Section 12.42 refers to a conviction, it does not refer to the primary conviction which will be enhanced, but rather is limited to the convictions which will be used for enhancement purposes. Section 12.41 applies only to the enhancing convictions. To determine whether the primary offense defined outside the Texas Penal Code is punishable under this chapter, one must look to V.T.C.A. Penal Code, Section 1.03(b). It provides:

"The provisions of Title 1, 2, and 3 of this Code apply to offenses defined by other laws, unless the statute defining the offense provides otherwise; however, the punishment affixed to an offense defined outside this Code shall be applicable unless the punishment is classified in accordance with this Code."

Section 12.41 is within Title 3 of the penal Code and the punishment for possession of heroin is classified in accordance with the Penal Code. Thus, as noted earlier, the offense may be enhanced. The second degree felony was properly enhanced to a first-degree felony. The appellant's ground of error is without merit. See Practice Commentary, Searcy and Patterson, V.T.C.A. Penal Code, Sec. 12.41. Also, see *Moreno v. State*, 541 S.W.2d 170 (Tex.Cr.App. 1976); *Passmore v. State*, 544 S.W.2d 399 (Tex.Cr.App.1976).

In appellant's final ground of error, he contends that the trial court erred in overruling his motion for mistrial after a witness for the State made a prejudicial and harmful statement. After Lopez testified that he could not remember giving earlier statements because he was suffering withdrawal from heroin and methadone, the State called Dr. Cameron to testify as an expert on the effects of withdrawal on a person. During cross-examination the following occurred:

"Q. Well, Doctor, then anyone that's been on it for two years basically, it's almost a foregone conclusion it's not possible to cure him anymore, is it?

A. I wouldn't make any bets on it. In other words, our experience is that methadone maintenance takes years.

Q. For years? All right, well, what is the problem? Isn't it kind of mind over matter? We have got a substance and yet the mind is the problem and it's the sickness in the mind?

A. Well, it would be sort of like losing weight. We have got an overweight and the people could lose weight and you could call it a sickness in the mind because they could and don't. But the symptoms, that really keeps the heroin addicts going for the most part is the fear of withdrawal, which you don't get in other things like over eating or something else, you see. The first thing he thinks about in the morning is where he is going to get that fix, because he doesn't—he knows what's going to happen. The cramping is going to start and everything else can too. You can ask your client and he can tell you better than I can.

Appellant's Counsel: I object to that. And I ask the Court—I can't believe it.

A. I'm sorry.

Appellant's Counsel: I would ask the Court to ask the jury to disregard that and ask for a mistrial.

The Court: Be overruled.

A. I'm sorry, I meant in general. I meant you could ask anyone in general who could use it and over a couple of years and will tell you about the need, the drive to get that fix the next day."

The appellant argues that the doctor's statement and the trial court's failure to sustain his objection was so prejudicial as to create reversible error. We cannot agree.

■ Initially, we note that the appellant made only a general objection to the state-ment and failed to inform the trial court of the basis of his complaint. The general objection did not preserve error. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

■ Furthermore, after a thorough examination of the entire record, we conclude that while the statement was erroneously admitted in evidence, it was harmless error. A judgment will not be reversed for admission of evidence that did not injure the accused. The question is whether there is a reasonable probability that the evidence complained of might have contributed to the conviction. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980); *Cunningham v. State*, 500 S.W.2d 820 (Tex.Cr.App. 1973). In the case at bar, the remark by the doctor was not solicited by either the prosecution or the trial court. The witness apologized for making the remark and attempted to explain what he had meant. Also, as the appellant stated in closing argument, it was obvious that the doctor was referring to Lopez and not the appellant. There had been no evidence that appellant used narcotic drugs. In fact, the prosecutor conceded twice in his closing argument that the appellant was not a user or addict of heroin. The case at bar was in no way dependent upon the doctor's remark. Therefore, we conclude in light of the evidence of guilt, the witness' apology and explanation, and the prosecutor's concession, that the minds of the average jury would not find the State's case less persuasive if the statement had not been made. The error was harmless.

The judgment is affirmed.

Before the court en banc.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

CLINTON, Judge.

On original submission a Court Panel affirmed the judgment of conviction after overruling three grounds of error presented by appellant, the first of which complained that the evidence in this circumstantial evi-

dence case is insufficient to support the verdict of guilt returned by the jury. We granted appellant leave to file a motion for rehearing in order to reconsider the finding of sufficiency made by the panel, and to that task we now turn.

The heroin which appellant is charged with possessing first appeared to peace officers when Charles Leon Chambers extended his arm and hand out the right rear window of a 1967 Pontiac LeMans from his position of a passenger in the right rear and dropped a plastic packet containing it onto the surface of Interstate 35. The heroin was in three envelopes tied together by a rubber band; it weighed 26.5530 grams—slightly less than an ounce. No other heroin, controlled substance or paraphernalia was found in the LeMans or on the person of its occupants.

Appellant had been driving the car. It belonged to Janie Alleman, who occupied the front passenger seat. Chambers' wife was on the back seat, next to him. The officers who handled them do not suggest anyone was under the influence of drugs.

The State concedes, as it must, that exclusive control of the heroin by appellant is not shown by the evidence. Its contention is that the evidence is sufficient "to link appellant with the heroin dropped ... by Charles Chambers." Though it recognizes the applicable rule to determine sufficiency when an accused is not in exclusive possession or control over the situs of the controlled substance, the State does not specify what it believes are "additional independent facts and circumstances which indicate the

[appellant's] knowledge of the [heroin] as well as his control over such," *Powell v. State*, 502 S.W.2d 705, 709 (Tex.Cr.App. 1973); *Williams v. State*, 498 S.W.2d 340, 341 (Tex.Cr.App.1973).

One underlying theory of the case is that after Henry Lopez drove up beside the LeMans and appellant entered the passenger side of the Chevrolet an exchange of heroin and money was transacted. Yet, neither officer who watched that incident testified to any movements by either Lopez or appellant indicating such an exchange.[1] Officer Montemayor followed the Chevrolet several blocks from Jim's until it turned off into an alley; the officer continued driving to a position that would enable him to spot which way the Chevrolet was going, but when he did not see it exit out of the alley Montemayor entered from the opposite end and located it in the parking lot of the Oso Negra Bar. He drove up to Lopez as the latter stood in the parking lot "counting *some* money."[2] From that the panel inferred that the money Lopez was counting had been received by him from appellant, and further inferred that Lopez had received the money from appellant in exchange for heroin back at Jim's Hamburgers.[3]

Before being recently amended Article 38.03, V.A.C.C.P., provided in pertinent part that an accused "is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt...." In a circumstantial evidence case that presumption is given effect by an appellate court in ascertaining whether guilt has been estab-

---

1. Officer Montemayor, located about thirty yards away, conceded he did not observe "anything exchange hands" between them. Officer Garza, too far from the Chevrolet to see its license plate or identify who was driving it, said he was "able to observe or see anything that passed" between them, but was not asked what, if anything, did.

2. This observation is stated in the words of Montemayor as he testified on cross-examination. On redirect the prosecutor had Montemayor revisit the Oso Negra parking lot and after he said that only that Lopez was "counting *some* money" and "counting money," came the following:

"Q: Did it look like a large *amount* of money?
A: Yes, sir."
Given the ambiguousness of the reported observations, we are unwilling to find that Lopez was "counting a large *sum* of money," in the sense of its total value. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

3. The panel opinion characterizes Lopez as a "known drug dealer," but when Officer Garza so testified appellant's objection was sustained. Officer Montemayor claimed that Lopez "deals in dope, heroin," but attributed that to hearsay reports.

lished to a moral certainty by refusing to "presume any acts against the accused that are not shown to have been committed by him," 24 Tex.Jur.2d 424–425, Evidence, § 742, quoted approvingly and applied by the Court in the leading opinion of *Culmore v. State*, 447 S.W.2d 915 (Tex.Cr.App.1969).[4] Thus, as *Culmore* pointed out, in *Arsiaga v. State*, 372 S.W.2d 538 (Tex.Cr.App.1963), the Court expressed "serious doubt" that circumstantial evidence was sufficient "where the accused was shown to be in a position to have come in contact with the contraband, but the State was unable to show that he had ever had the same in his control and custody."

Just so in the case at bar. Appellant was shown to be in a position to have received the heroin, but the State did not show he ever actually possessed it. Acts must be presumed against appellant to conclude that he obtained heroin from Lopez while in the latter's Chevrolet in the parking lot at Jim's. That will not do for again as stated in *Culmore*, supra:

> "A conviction on circumstantial evidence cannot be sustained on proof amounting only to a strong suspicion or mere probability. Such proof does not exclude every other reasonable hypothesis except that of guilt of the accused." *Id.*, at 917.

**4.** Last term a Court Panel updated the authorities that built, e.g., on *Culmore* to confirm rules for examining a conviction on circumstantial evidence, and with those rules in mind concluded that "while the circumstances . . . lead to a strong suspicion or probability that the appellant committed the murder, it does not exclude to a moral certainty every other reasonable hypothesis except appellant's guilt as required by the law of circumstantial evidence," *Nathan v. State*, 611 S.W.2d 69, 75, 78 (Tex.Cr.App. 1981). See also *Urtado v. State*, 605 S.W.2d 907 (Tex.Cr.App.1980).

**5.** It is often said that "the law does not permit the pyramiding of one assumption upon another because an ultimate fact thus arrived at is too conjectural and speculative to support a judgment," *Texas Pacific Coal & Oil Co. v. Wells*, 151 S.W.2d 927, 930 (Tex.Civ.App.— Waco, 1941) affirmed *Wells v. Texas Pacific Coal & Oil Co.*, 140 Tex. 2, 164 S.W.2d 660 (Comm.App.—Opinion Adopted, 1942): "That would be to permit an inference to be drawn from highly conjectural testimony and then to draw a still further inference from that infer-

■ Without any doubt, we accept the obvious: appellant and Lopez met in the latter's Chevrolet for a few minutes, parted and each went his separate way. But only a strong suspicion or mere probability would suggest that a transaction took place then and there which produced the plastic bag with envelopes containing heroin being later dropped by Chambers out the right rear window of the LeMans on the highway.[5]

■ The panel opinion noted testimony of Officer Montemayor that after his encounter with Lopez in the Oso Negra parking lot his informant told him that Lopez had sold heroin to appellant. This hearsay, however, cannot be used in determining sufficiency of the evidence to provide an affirmative link between appellant and the contraband. *Ayers v. State*, 570 S.W.2d 926, 928 (Tex.Cr.App.1978). "[I]nadmissible hearsay . . . admitted without objection, may not be used for any purpose," Ray, Law of Evidence, § 31, 1 Texas Practice 44–45; *Ex parte Hebert*, 579 S.W.2d 486 (Tex.Cr.App.1979). "Incompetent evidence is insufficient to sustain a conviction," 24 Tex.Jur.2d 426, Evidence, § 742. See *Alexander v. State*, 587 S.W.2d 729, 732 (Tex.Cr.App.1979); *Knapik v. Edi-*

ence," *id.*, at 663. However, Chief Justice Cadena has also fairly well demonstrated that actually there is not a judicial rule against "pyramiding inferences," and that "[t]he true nature of the rule against cumulative inferences . . . [is] merely '. . . a shorthand rendition of the rule which requires that verdicts be based on more than surmise and guesswork.' *Phoenix Ref. Co. v. Powell*, 251 S.W.2d 892, 902 (1952, writ ref'd n.r.e.)," *Royal Indemnity Co. v. Hume*, 477 S.W.2d 683, 686, 687, n. 1 (Tex.Civ. App.—San Antonio, 1972 no writ history).

The general rule in criminal law in this respect is that a conviction on circumstantial evidence cannot be sustained upon proof "amounting only to a strong suspicion or mere probability," *Brock v. State*, 162 Tex.Cr.R. 339, 285 S.W.2d 745, 747 (1956). But see *Lee v. State*, 152 Tex.Cr.R. 401, 214 S.W.2d 619, 622 (1948): "This would be tantamount to basing one inference upon another inference in order to reach such conclusion. This cannot be done under the rule of evidence."

*son Bros., Inc.*, 313 S.W.2d 335 (Tex.Civ. App.—Waco, 1958 writ ref'd).

■ The panel opinion remarked that Lopez's "denial of selling heroin to the appellant was impeached," by his prior inconsistent statements in earlier pretrial testimony. "Under the almost universal practice, well established in Texas, such statements cannot be used as substantive evidence of the truth of the facts stated," Ray, op. cit. supra, at § 688, 1 Texas Practice 626. Since the jury was so instructed, the most it could conclude was that Lopez was not truthful, and nothing was left in his testimony to support the State's case. See, Ray, op. cit., supra, 1 Texas Practice at 627: "... if the only evidence of an essential fact is such a prior statement, the party's case will fail for lack of proof."

■ As to those two matters, then, the informant's hearsay and impeachment of Lopez are not "independent and additional facts and circumstances" to be considered in the affirmative linkage formulation. Nor are the hearsay reports that Lopez is "a known dope dealer." Cf. *Spinelli v. United States*, 393 U.S. 410, 418–419,[6] 89 S.Ct. 584, 590, 21 L.Ed.2d 723 (1964). Accordingly, we find that the underlying theory of the case on which the panel opinion upheld the judgment was not proved by sufficient circumstantial evidence.

However, the trial court also authorized the jury to convict under the law of parties that was fully explained abstractly and plainly applied to the facts.[7] Thus, we must address sufficiency of the evidence to show appellant criminally responsible for the conduct of another in committing the offense. See *Sewell v. State*, 578 S.W.2d 131, 136 (Tex.Cr.App.1979).

The panel opinion related that after about fifteen minutes at the Pizza Hut the two males left in the LeMans, "the officers did not follow them," and the males returned fifteen to twenty minutes later. But the record reveals more of interest about movements during that time period than the panel noted.

■ It will be recalled that Officers Montemayor and Garza, each driving an unmarked police car, set up a "stake out" on Jack's Ice House because an informant had told Montemayor that persons[8] in a 1967 maroon Pontiac LeMans were coming there to make a "heroin buy."[9] The ice house is located at Northwest 20th Street and West Commerce. After twenty minutes or so Officer Garza spotted such a LeMans making a turn from 20th Street onto West Commerce and move westerly; it proceeded to a Pizza Hut at 24th Street and West Commerce.[10] Notified of its where-

6. "All that remains to be considered is the flat statement that Spinelli is 'known' to the FBI and others as a gambler. But just as a simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause, we do not believe it may be used to give additional weight to allegations that would otherwise be insufficient."

7. In the first respect, *inter alia*, the charge tracked V.T.C.A. Penal Code, § 7.02(a)(2), holding a person criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

In the latter respect, the jury was instructed to find appellant guilty if it found from the evidence beyond a reasonable doubt that on the occasion alleged appellant "either acting alone or with another" possessed the Heroin.

See generally *Galvan v. State*, 598 S.W.2d 624, 629 (Tex.Cr.App.1979).

8. Officer Garza understood "two couples were coming in from Austin..."

9. When Officer Montemayor volunteered that Jack's Ice House is "a known drug connection," appellant's objection was sustained. However, Officer Garza, answering a question about where he stationed himself near Jack's Ice House, interjected the same characterization, "a known heroin connection," without objection. No doubt the jury so understood the reputation of the ice house.

10. The prosecutor thoughtfully had Officer Montemayor prepare and other witnesses mark a diagram of the area, locating Jack's Ice House, the Pizza Hut and other places mentioned in testimony. Though ultimately admitted in evidence as State's Exhibit No. 1, it is not in our record. Similarly, State's Exhibit No. 2, depicting the layout around Jim's Hamburgers. Throughout presentation of evidence, references to locations by questioners and witnesses

abouts by Garza, Montemayor left his location near Jack's Ice House and drove the four blocks or so to a place near the Pizza Hut and, with Graza, kept the LeMans and its occupants under surveillance. As Garza was to explain, "We were just keeping the car and the people under surveillance as best as possible. We didn't know *when* the deal was going to go down."

The two men first left the LeMans and went into the Pizza Hut and in "a couple of minutes" Chambers came back to the car and with the females returned to the inside. Garza noticed that the two men were "hanging around right around the door" where he believed there is a telephone, although he did not recall "being able to see whether they made a phone call." After about fifteen minutes Chambers and appellant left, got in the LeMans and drove away on West Commerce in the direction of Jack's Ice House.[11]

Strictly speaking, as the panel opinion had it, "the officers did not follow them." However, Montemayor did pull out from his location "and went around behind the Handy Andy through some streets ... [and] ... was going to come back around to see if it would come over here. (Indicating.)"—we are sure, Jack's Ice House.[12]

Montemayor was back near the Pizza Hut when he saw the LeMans return; the males went inside and in ten or fifteen minutes they and the two females came out as if to leave in the LeMans. However, according to Garza, at that moment two marked police cars pulled into the parking lot and, seeing them, the foursome reentered the Pizza Hut;[13] after the police cars left they came out shortly and got in the LeMans.

The LeMans drove north on 24th Street and stopped "quite a few blocks over" at Jim's Hamburgers near the corner of Bandera and Culebra. There, appellant walked back and forth in front of a telephone booth and once went into it, but Officer Montemayor candidly stated, "I'm not sure if he used the phone or not." The officer did watch Janie Alleman as she left the LeMans and went inside Jim's to a corner where restrooms are located; she "walked straight into the back" and when she returned Montemayor "wasn't sure if she was carrying out something," and the Lopez Chevrolet "pulled up next to her."[14] It was then that appellant walked over to the passenger's side of the Chevrolet and got in. Meanwhile Janie Alleman reentered the LeMans and shortly appellant did also. Both vehicles departed Jim's and the separate events related in the panel opinion followed.

An accused may be shown by circumstantial evidence to be a party to the possession of a controlled substance, viewing the evidence of events before, during

---

are shown in the record as "(indicating)," but without the exhibits before us some testimony is hard to follow. Since the exhibits were designed to assist the jury in understanding the testimony, just as important is that a reviewing court also be aided. Thus, it behooves every responsible trial participant, particularly the court reporter, to make certain that the record contains such exhibits.

11. Both Montemayor and Garza watched the two men depart in the LeMans. Garza did not specify who was driving, but Montemayor said appellant was then, and at all times he had the LeMans under surveillance.

12. This, because the next questions put by the prosecutor and answers by Montemayor are:
"Q: All right, now, did you ever, yourself, arrive at Jack's Ice House?
A: No, sir, I didn't.
Q: Okay. You had a conversation with someone?
A: Yes, sir."

And, further, because when asked on crossexamination why he took the circuitous route, Montemayor replied, "I was going to see if they were going to Jack's Ice House," and then went on to explain that he never got there in that he came across his informant along the way and was told that the LeMans did go to the ice house, so Montemayor returned to the Pizza Hut confident that the LeMans would come back to pickup the two women who were still inside.

13. The incident was purely coincidental for the police cars were not part of Montemayor's operation. Garza explained that uniformed officers normally stop by the Pizza Hut to eat.

14. Again, the court reporter shows Montemayor was "(indicating)," so he may well have said "here" rather than "her," but either way she was still nearby.

and after commission of the offense. *Sewell v. State*, supra, at 136–137; *Wygal v. State*, 555 S.W.2d 465, 468–469 (Tex.Cr.App. 1977). "In determining whether one has participated as a party, . . . reliance may be placed on actions of the parties which show an understanding and common design to do a certain act." *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex.Cr.App.1978); *Alexander v. State*, 607 S.W.2d 551 (Tex.Cr.App. 1980); *Wygal v. State*, supra; cf. *Morrison v. State*, 608 S.W.2d 233 (Tex.Cr.App.1980).

■ Presence at the scene of an offense is "a circumstance tending to prove guilt which may show in combination with other facts that the accused participated in the commission of the offense," *Alexander v. State*, supra, at 553.

We start with the unassailable fact that heroin was in the personal, physical possession of Chambers when the LeMans was stopped.[15] Clearly the mission of one or more persons in the LeMans to acquire heroin in San Antonio had been accomplished, and the acquisition was made at some point during the purposeful driving of the LeMans by appellant.

Though registered to Janie Alleman, on every occasion observed by officers in San Antonio the LeMans had been driven by appellant. Moreover, except for the moment it took for Chambers to return to the LeMans and bring the women into the Pizza Hut when they first went there, and the minutes appellant paced the sidewalk and in the Lopez car at Jim's, appellant and Chambers were together the three or so hours the foursome was in San Antonio. Appellant knew the location of Jack's Ice House or he learned it from someone. He drove to the nearby Pizza Hut and went in with Chambers to stand around the door near where Garza believed there is a telephone. Shortly, he drove towards Jack's Ice House with Chambers, and they were apart from the women for some fifteen or twenty minutes. Returning to them and while leaving, appellant stepped back into

the Pizza Hut with his companions to avoid an encounter with uniformed policemen. He drove the several blocks over to another location, Jim's Hamburgers, where none of the four patronized the place. Whatever his business with Lopez, when it was done appellant rejoined the others waiting in the LeMans and drove it away to Interstate 35 on the way back to Austin.

Thus, unlike the situation in *Sewell v. State*, supra, where the only showing was that the accused had been a *passenger* in an automobile for a prolonged period of time before a plane load of marihuana was transferred into a pickup truck but was not in it when the automobile was stopped on account of its participation in the offense, the driver of an automobile in which one or more passengers are questing for heroin is practically acting with intent to promote or assist in the endeavor by aiding or attempting to aid in its success—provided it may be reasonably inferred that the driver is aware of the quest. See *Alexander v. State*, supra. Given the facts of where they went while in San Antonio and that appellant and Chambers were together most of the time—certainly never out of the sight of one another—and they were with Janie Alleman and Mrs. Chambers except when they went off towards Jack's Ice House and when Janie apparently went to the restroom at Jim's, the jury could have justifiably believed that appellant was aware that their mission was to obtain heroin, and that it was accomplished. *Rodriguez v. State*, 373 S.W.2d 258 (Tex.Cr.App.1963); *Dickerson v. State*, 372 S.W.2d 678 (Tex.Cr.App. 1963); and see *Davila v. State*, 169 Tex. Cr.R. 502, 335 S.W.2d 610 (1960).

In such "throwaway" cases upholding conviction of the driver for possession of the contraband jettisoned by another the Court has alluded to some unusual manner in which the vehicle was being driven, apparently to indicate "consciousness of guilt," Ray, op. cit. supra, at § 1538, 2 Texas Practice 242, but it has not held some

15. As the marked police car driven by Officer Pierdola accomplished that, his reaction was "the people in the rear seat had turned around and . . . were moving around in the back seat," conceding, however, that he could not tell "what they were doing."

kind of evasive action is essential for criminal responsibility of the driver to attach to the conduct of another's commission of the offense. A course of driving conduct in the particular circumstances of a given situation culminating with a "throwaway" of contraband may well be sufficient to show awareness on the part of the driver of the purpose and objective of his driving conduct, and in the case at bar we find it is.

The motion for rehearing is denied.

TEAGUE, J., concurs in result.

ROBERTS, J., dissents.