COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOSE LUIS PEREZ, | § | No. 08-07-00219-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 384th Impact Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC#20040D00050) |
| | § | |

**O P I N I O N**

Jose Luis Perez was convicted by a jury of unlawful possession of at least 50, but less than 2,000, pounds of marijuana. He was sentenced to ten years' imprisonment, which was suspended and he was placed on community supervision. We affirm the conviction.

Sergeant Guadalupe Ruiz is as an undercover narcotics officer with the El Paso Police Department. During December 2003, an informant working with Sergeant Ruiz identified a tractor-trailer as one possibly being used to transport drugs. This trailer was housed at a warehouse located at 1533 Bassett Ave. in Central El Paso.[1] Sergeant Ruiz began surveillance on the warehouse, and, during the course of the surveillance, he observed a trailer in front of the Bassett warehouse being unloaded and its contents being placed along a fence. While the trailer was being unloaded, Sergeant Ruiz also observed two people on bicycles looking into cars in the vicinity, which, Sergeant Ruiz indicated, suggested a counter-surveillance operation. After the off-loading of the merchandise, the truck was re-loaded. The entire off-loading and re-loading

---

[1] During the course of the investigation, Sergeant Ruiz learned that the Bassett Ave. warehouse was being rented by one of the drug cartels located in Cd. Juárez, Chih., which is located directly across the Rio Grande from El Paso.

process took about an hour to complete. After the completion of the re-loading, Sergeant Ruiz then observed the trailer being moved to a fenced yard, where it was un-hitched and left. Sergeant Ruiz testified that he never observed any marijuana being loaded onto the trailer during the one-hour off-loading and re-loading period. Indeed, Sergeant Ruiz never observed any drugs being placed inside the trailer during the course of his surveillance operation.

At 6 p.m., Sergeant Ruiz handed over the surveillance operation to two other police officers for the evening. These were Officers Jesus Rodriguez, Jr. and Gabe Peralta, both members of the El Paso Tactical and Gang Enforcement Unit. During the course of the surveillance operation, no officer was able to identify the driver of the tractor, and Appellant was never positively identified as the driver during the loading and unloading of the trailer. Appellant was also never identified as one of the men un-loading and re-loading the trailer.

At the time of Appellant's arrest, he was employed by Menoli Express. Menoli and its truck yard are located at 3101 North Zaragoza Rd. in El Paso. Testifying in his own defense, Appellant stated that he received a phone call on December 15 from Menoli, asking him to report to work. After he arrived at Menoli, Appellant was sent to Trans-Expedite, Inc., located on Founders Blvd., to pick up his merchandise, which he was supposed to transport to various parts of the country. He then returned to the Menoli yard around 7:20-7:30 p.m., where he locked up his truck and left for the night.

The next morning, December 16, Appellant went back to Menoli to pick up his tractor-trailer at around 9 a.m. At 9:15, Appellant discovered that one of the lights on the trailer was not working, so he took it to Utility Trailer Southwest Sales Company (Utility), at 11630 Gateway Blvd. East, for repairs. After dropping off the trailer at Utility, Appellant testified, he went back to Menoli, where he left his tractor and returned home.

At 6 p.m., Appellant received a phone call from Menoli, instructing him to leave right away. Appellant testified that, when he arrived at Menoli, his trailer was not there, so he took his tractor and went to the Petro fuel station at I-10 and Horizon Blvd. to fill up with diesel. After filling up, Appellant testified, he went to pick up his friend at the intersection of Piedras St. and Alameda Ave. After waiting for his friend for twenty minutes, Appellant drove to the Bassett warehouse, where he picked up his trailer. It took Appellant about forty minutes to hook his tractor to the trailer and to inspect the rig.

Between 8 and 8:30 p.m, the surveillance team saw the tractor arrive at the Bassett warehouse and back into the side yard, where the trailer was located. At the same time, people on bicycles resumed their counter-surveillance of the area. The tractor remained in the fenced yard for forty-five minutes to an hour. At around 9 p.m., a blue tractor hitched with the trailer pulled out of the fenced yard onto Piedras St. Officer Rodriguez observed two vehicles which appeared to be escorting the tractor-trailer, a red car in front of the tractor-trailer and a black pickup behind it. At this time, the surveillance team called a marked unit and requested it to effect a traffic stop on the tractor-trailer.

Officer Sanchez observed Appellant fail to signal as he turned from Piedras onto Gateway East; based on this violation, Officer Sanchez stopped the Appellant. Officer Sanchez testified that Appellant initially appeared nervous. According to the officer, Appellant also gave several different accounts of where he had come from. At first, Appellant stated that he had come from the Northeast side of El Paso. Because the Appellant was driving north on Piedras at the time of the traffic stop, Officer Sanchez asked the Appellant again where he was coming from. This time, Appellant said that he was coming from trying to pick up his partner at Piedras and Alameda and that he had waited for thirty minutes for his partner, who never showed up. Later,

Appellant told Officer Sanchez that, after he had inspected the back of the truck, he had "fueled up, gone and picked up the load, picked up the – fixed the trailer – fixed the truck or the trailer, picked up the 'carga' [i.e., the load to be transported] and, then, was on his way to go pick up his partner."

There was also some confusion about what exactly Appellant was hauling. Appellant produced several documents for Officer Sanchez when he was stopped. The documents included three bills of lading (two of which were for prior deliveries), a fuel receipt, a driving log, and a repair receipt. The current bill of lading was for a load that was supposed to have been delivered in Oklahoma that day, making the intended delivery impossible, considering the time of day and the distance involved.

Officer Sanchez looked for a seal on the back of the trailer. Seals are placed on the backs of trailers to prevent tampering with the load, thus improving load security. Officer Sanchez testified that there was no seal on the back of the truck, and, after further questioning, Officer Sanchez asked Appellant for his consent to search the trailer. Appellant voluntarily gave both his oral and written consent to allow officers to search the trailer. After consent was given, K-9 handler Santos Perez testified that his dog detected the presence of narcotics from underneath the trailer and at the back of the opened trailer. Officer Perez also testified that he could smell marijuana from the back of the opened trailer. On the other hand, Officer Sanchez testified that he did not smell the marijuana until he got about half way through the trailer, which was where the boxes containing the marijuana were located.

Officers Sanchez, Rodriguez, and Sagaribay searched the truck and found boxes that looked different from the rest of the load in the trailer and that also smelled like marijuana. The boxes contained large bundles wrapped in plastic, which were later determined to contain

marijuana. At this point, the Appellant was placed under arrest. During the Appellant's arrest he appeared calm, did not ask any questions, and was not shocked that he had just been arrested. The boxes found in the trailer contained 675 bundles of marijuana, weighing a total of 1,643.9 pounds. Sergeant Ruiz explained that the wholesale price of marijuana in El Paso is $300 per pound, and the street price for a half-ounce is $20. Officer Enrique Ledesma, who is the narcotics custodian for the El Paso Police Department, testified that no fingerprints were found on the boxes containing the marijuana and no search for fingerprints was done on the boxes.

Gary Zelenak, Trans-Expedite's Vice-President for Sales and Marketing, testified that a seal had, in fact, been placed on the trailer and that the seal's number was recorded on one of the bills of lading for the shipment. Zelenak also explained that trailers tend to be loaded with the last destination being loaded first and the first destination being loaded last, although he conceded that the loading does not always ensure that the first delivery will be closest to the door or that the loading is always done properly.

Based on his experience as a narcotics investigator, Sergeant Ruiz testified that an owner of narcotics usually hires someone to transport the drugs and that the person hired usually knows what he is transporting, because someone who does not know the contents of his load would not be the best person to haul narcotics. Sergeant Ruiz also testified that the people observed looking into the trailer during the re-loading process were most likely the owners of the narcotics looking for the best placement of the drugs to make the entire shipment look legitimate.

Appellant denied telling the police that he had just come from Northeast El Paso when he was stopped, denied having given oral consent to search his trailer, and stated that he had nothing to hide.[2]

---

[2] Appellant concedes, however, that he did give written consent to do so.

In his Issue No. One, Appellant contends that the evidence was legally insufficient to prove that he knowingly or intentionally possessed at least 50, but less than 2,000, pounds of marijuana.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could find the essential elements of the offense, as alleged in the application paragraph of the charge to the jury, beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). More particularly, sufficiency of the evidence is measured by the elements of the offense, as defined by the hypothetically-correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 239-40 (Tex. Crim. App. 1997).

Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Dwyer v. State*, 836 S.W.2d 700, 702 (Tex. App.–El Paso 1992, pet. ref'd). We do not resolve any conflict in fact, weigh any evidence, or evaluate the credibility of any witnesses, so the fact-finding results of a criminal jury trial are given great deference. *Menchaca v. State*, 901 S.W.2d 640, 650-52 (Tex. App.–El Paso 1995, pet. ref'd); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); *Leyva v. State*, 840 S.W.2d 757, 759 (Tex. App.–El Paso 1992, pet. ref'd); *Bennett v. State*, 831 S.W.2d 20, 22 (Tex. App.–El Paso 1992, no pet.). Instead, our only prerogative is to determine whether both the explicit and implicit findings of the trier of fact are rational, by viewing all the evidence admitted at trial in the light most favorable to the verdict. *Adelman*, 828 S.W.2d at 421-22. In so doing, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson*, 819 S.W.2d at 843 (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). The trier of fact, not the appellate court, is free to accept or reject all or any portion of

any witness's testimony. *Belton v. State*, 900 S.W.2d 886, 897 (Tex. App.–El Paso 1995, pet. ref'd).

Unlawful possession requires that the "State . . . prove two elements: (1) that the accused exercised care, control and management over the contraband; and (2) that the accused knew the matter was contraband." *Martin v. State*, 753 S.W.2d 384, 386 (Tex. Crim. App. 1988) (citing *Nunn v. State*, 640 S.W.2d 304 (Tex. Crim. App. 1982)); *Davila v. State*, 930 S.W.2d 641, 644-45 (Tex. App.–El Paso 1996, pet. ref'd).

To prove that Appellant had both knowledge and control, the State had the burden to prove an affirmative link between him and the marijuana contained in his truck, because no direct evidence showed that Appellant knowingly or intentionally possessed the marijuana. TEX. HEALTH & SAFETY CODE ANN. § 481.115(a) (Vernon 2003); *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985); *Brown v. State*, 911 S.W.2d 744 (Tex. Crim. App. 1995); *Menchaca*, 901 S.W.2d at 651. An affirmative link generates a reasonable inference that the accused knew of the contraband's existence and exercised control over it. *Brown*, 911 S.W.2d at 747.

Factors we consider include (1) the defendant's presence when the search warrant was executed, (2) whether the contraband was in plain view, (3) the defendant's proximity to and the accessibility of the narcotic, (4) whether the defendant was under the influence of narcotics when arrested, (5) whether the defendant possessed other contraband or narcotics when arrested, (6) whether the defendant made incriminating statements when arrested, (7) whether the defendant attempted to flee, (8) whether the defendant made furtive gestures, (9) whether there was an odor of the contraband, (10) whether other contraband or drug paraphernalia were present, (11) whether the defendant owned or had the right to possess the place where the drugs were found,

(12) whether the place where the drugs were found was enclosed, (13) whether the accused was the driver of the automobile in which the contraband was found, (14) whether the defendant was found with a large amount of cash, and (15) whether the conduct of the accused indicated a consciousness of guilt. *Tucker v. State*, 183 S.W.3d 501, 510 (Tex. App.–Fort Worth 2005, no pet.) (citing *McQuarters v. State*, 58 S.W.3d 250, 259 (Tex. App.–Fort Worth 2001, pet. ref'd)).

The number of factors linking an accused to the contraband is not as important as their logical force in establishing the elements of the offense. *See Jenkins v. State*, 76 S.W.3d 709, 713 (Tex. App.–Corpus Christi 2002, pet. ref'd); *see also Jones v. State*, 963 S.W.2d 826, 830 (Tex. App.–Texarkana 1998, pet. ref'd); *Gilbert v. State*, 874 S.W.2d 290, 298 (Tex. App.–Houston [1st Dist.] 1994, pet. ref'd). Proof amounting to a strong suspicion, or even a probability, of guilt will not suffice. *See Hall v. State*, 86 S.W.3d 235, 240 (Tex. App.–Austin 2002, pet. ref'd).

There must be an affirmative link between an accused and the drugs, to the degree that a reasonable inference may arise that Appellant knew that the drugs existed and where they were kept. *See Gutierrez v. State*, 628 S.W.2d 57, 60 (Tex. Crim. App. [Panel Op.] 1982), *overruled on other grounds by Chambers v. State*, 711 S.W.2d 240, 247 (Tex. Crim. App. 1986). Ultimately, the question of whether the evidence is sufficient affirmatively to link the accused to the contraband must be answered on a case-by-case basis. *Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.–Austin 1991, pet. ref'd).

Several affirmative links were put into evidence by the State. Appellant was present while the search of his trailer was conducted, the odor of marijuana was present from the back of the opened trailer, Appellant was the driver of the tractor-trailer transporting 1,643.9 pounds of fresh marijuana, and the Appellant appeared nervous and gave differing and confusing accounts

of his activities leading up to his arrest.

Beyond the non-exclusive list of affirmative links, other circumstantial evidence exists, which a jury could have relied on in making its determination. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006) (recognizing that affirmative links are non-exclusive and can be used singularly or in combination); *see also Willis v. State*, 192 S.W.3d 585, 593 (Tex. App.–Tyler 2006, pet. ref'd); *Lassaint v. State*, 79 S.W.3d 736, 740-41 (Tex. App.–Corpus Christi 2002, no pet.). The State correctly notes that other pieces of circumstantial evidence exist, supported by case law and the record, on which the jury could have rationally concluded that Appellant had knowledge of the marijuana in his trailer.

First, Appellant's trailer contained a large quantity of marijuana, almost 1,700 pounds. Sergeant Ruiz testified, based on his narcotics investigation experience, that, if drugs are being transported, it is not a good idea for the driver not to know what he is transporting. Consistent with Sergeant Ruiz's testimony as a narcotics investigator, Texas courts have found that the presence of a large amount of contraband indicates that the person accused of possession probably knew of its presence. *Hill v. State*, 755 S.W.2d 197, 201 (Tex. App.–Houston [14th Dist.] 1988, pet. ref'd) (citing *Carvajal v. State*, 529 S.W.2d 517, 520-21 (Tex. Crim. App. 1975), *cert. denied*, 424 U.S. 926 (1976)). Further, as the State correctly points out, courts have recognized that large amounts of narcotics, like 1,700 pounds of marijuana, would most likely not be entrusted to someone who had no knowledge of its presence. "It was a rational inference that Appellant would not have been entrusted in taking the valuable cargo . . . if he were a mere innocent, ignorant of all the details surrounding his responsibility and the importance of the cargo in his care." *Menchaca*, 901 S.W.2d at 652; *see also Castellano v. State*, 810 S.W.2d 800, 806 (Tex. App.–Austin 1991, no pet.). Sergeant Ruiz indicated the wholesale price per pound of

marijuana is around $300. This places the wholesale value of the contraband at $493,170, making the contraband important and valuable cargo to its owner. The jury could reasonably have inferred and found that Appellant was no stranger to the ongoing drug trafficking operation operating out of the Bassett Ave. warehouse and that he was a knowing and willing participant.

During Appellant's arrest, he appeared calm, did not ask any questions, and was not shocked that he had just been arrested. It is reasonable that a jury could have inferred from the lack of shock or surprise that Appellant was aware of the presence of drugs in his trailer. *Bethancourt-Rosales v. State*, 50 S.W.3d 650, 655 (Tex. App.–Waco 2001, pet. ref'd). "[E]xhibit[ing] unnatural equanimity and lack of concern throughout the temporary detention and the subsequent investigation" links Appellant with the contraband in question. *Fields v. State*, 932 S.W.2d 97, 104 (Tex. App.–Tyler 1996, pet. ref'd).

Last, the State points out that Appellant's conduct was not consistent with that of an ordinary and responsible truck driver. The vice-president of sales and marketing of Trans-Expedite testified that Appellant was personally responsible for the load Trans-Expedite was contracted to haul. On the witness stand, Appellant admitted that, at the time he picked up his cargo from Trans-Expedite, he had not looked at the paperwork he signed and did not know what he was hauling. Appellant did not observe his trailer being loaded or check the load before he left Trans-Expedite. Appellant did not ensure that a seal was on the back of the truck, which is customary in the trucking business and designed to ensure that no one has tampered with his cargo. Appellant did not inspect the lights on his trailer when he originally picked it up on December 15. He left his trailer loaded in the Menoli truck yard overnight without a seal to prevent tampering. After leaving his truck unattended and without a seal, Appellant did not inspect his load on the night of December 16 to make sure that the load he was about to transport

was the same load he had signed for or to check for tampering. Last, Appellant admitted on the stand that he normally inspects his tractor and trailer every time he hooks the trailer up to the tractor, except in the present case. It was a reasonable inference, based on Appellant's deviations from his standard procedure, that, for this trip at least, he was not a normal truck driver and that he could have been working in concert with a drug-trafficking operation, fully aware of the contraband he was transporting.

Even considering and accepting as true that, as Appellant testified, he never said that he was coming from the Northeast; no finger prints were found on the marijuana; no odor emanated from Appellant's closed trailer; Appellant did not attempt to flee; he did not exhibit any furtive gestures; no weapons or large amounts of money were found on him at the time of his arrest; and he was not seen at the Bassett warehouse during the surveillance operation, enough evidence was presented that a jury could rationally have found Appellant guilty of unlawful possession.

We do not resolve any conflict of fact or assign credibility to the witnesses, as that was the function of the trier of fact. *See Adelman*, 828 S.W.2d at 421; *Matson*, 819 S.W.2d at 843. Instead, our duty is only to determine whether both the explicit and implicit findings of the trier of fact are rational, by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson*, 819 S.W.2d at 843.

This Court concludes that the circumstantial evidence, when viewed in combination and its sum total, is sufficient evidence connecting Appellant to the actual care, custody, control, or management of the marijuana found in his trailer. It is the logical force of the circumstantial evidence, not the number of affirmative links, that supports a jury's verdict. The logical force of the combined circumstantial evidence in this case, along with reasonable inferences, is sufficient

to establish beyond a reasonable doubt that Appellant exercised actual care, custody, control, or management of the marijuana.

We overrule Issue No. One.

In his Issue No. Two, Appellant asserts that the evidence was factually insufficient to sustain his conviction.

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong of *Johnson,* we cannot say that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit, had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial, simply because we disagree with the jury's resolution of that conflict. Before finding that the evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting our factual-sufficiency review, we must also discuss the evidence which Appellant claims is the most important in allegedly undermining the finding. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). We defer to the fact finder's determination of witnesses' credibility and of the weight to be given to the evidence. *Cleveland v. State*, 177 S.W.3d 374, 388 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd), *cert. denied*, 547 U.S. 1073 (2006).

Here, Appellant argues several points that directly deal with witness credibility and the weight of the evidence. While it is true that Sergeant Ruiz did testify that he observed only the loading and unloading of electronic equipment, the jury could have determined that this testimony was irrelevant, or given it little weight, or concluded that something was missed during the course of the surveillance operation. There are any number of inferences and judgments that the jury could have made, and it is not the job of this Court to second guess the determinations of the jury made during their deliberations. Regardless of Sergeant Ruiz's testimony about never having observed drugs during the unloading and loading, almost 1,700 pounds of fresh marijuana were found in Appellant's trailer. The very fact that marijuana was found in the Appellant's trailer is a strong piece of evidence, resting on its own.

Appellant argues that the jury should not have assumed that the tractor originally observed by Sergeant Ruiz early on December 16, with the assistance of his informant, was the same tractor observed driving into the Bassett warehouse that evening. The record, however, indicates that the State did not attempt to link the tractor seen earlier in the day with the one seen later in the day. The jury could have believed that two different tractors had been at the Bassett warehouse on December 16; alternatively, the jury could have determined that the number of tractors was not important to their determination of guilt. The surveillance described at trial merely established the original suspicion that the Bassett warehouse was possibly being used as a cover for the transportation of narcotics. Testimony about the surveillance operation put the investigation into context, but it does not appear that the State relied extensively on information obtained during the surveillance operation to prove Appellant's guilt. Initially, Appellant was stopped because of a traffic violation, not pursuant to a warrant based on information garnered from the surveillance operation. Following the traffic stop, Appellant consented to his trailer

being searched, which led to the discovery of the stash of marijuana.

Appellant argues that it is unlikely that he could have driven his trailer to the Utility repair shop located on the far east side of El Paso, had the trailer repaired there, and then hitched it up to his tractor and driven across town to the warehouse at 1533 Bassett Ave. in Central El Paso, all before 11:30 a.m. on the same day. Appellant admits, however, that this scenario is possible. The State also points out that the Appellant testified that he dropped off his trailer for repairs at 9:15 a.m. on December 16, which gave him 2½-3 hours to have his trailer repaired and then drive to downtown. For a similar time comparison, the State points out that Appellant testified that he filled up his tractor at 6:30 p.m. on the far east side of El Paso, arrived at Piedras and Alameda between 7 and 7:30 p.m., stayed twenty minutes, and still made it back to the Bassett location by 7:50 p.m. The jury could have inferred, based on the re-fueling time line, that the State's version of the repair time line was also possible, given the relatively similar distances and time requirements. While any number of possible alternative theories exist, it is the jury's job to sort through the evidence and make a factual determination. *Cleveland*, 177 S.W.3d at 388. When viewing the evidence in its totality and in a neutral light, the possibility or the impossibility of the repair time line (which Appellant concedes is possible, even if arguably improbable) does not so undercut the State's case as to lead to a conclusion that the evidence in favor of conviction was factually insufficient.

Last, the record indicates that several different versions of the Appellant's conversation with Officer Sanchez exist. Appellant argues that the jury should have accepted his version of his activities prior to his arrest, which is, of course, more favorable to his case. Officer Sanchez testified that the Appellant initially said he had come from the Northeast part of El Paso. Officer Sanchez then reminded Appellant that he was traveling north on Piedras. Appellant replied by

saying, "Well, I'm going to go pick up my partner." Appellant then told Officer Sanchez that he had been waiting for his partner for thirty minutes at the intersection of Alameda and Piedras, which Officer Sanchez testified was not true, because he had been following Appellant's trailer since he left the Bassett warehouse. Further, Officer Sanchez also testified that Appellant never stopped at the Alameda/Piedras intersection. On cross-examination, Officer Sanchez testified that he asked Appellant where he had picked up his cargo, and Appellant said from the Northeast. According to Officer Sanchez, Appellant did not state when he had picked up his cargo from the Northeast.

Appellant testified, conversely, that he never said to Officer Sanchez that he had come from the Northeast. It is, however, the jury's job to reconcile the evidence and to determine which version(s) of the facts to base their verdict on. *Cain*, 958 S.W.2d at 407. The jury can decide to believe all, some, or none of the evidence presented at trial. *Id.* at 407 n.5.

In reviewing Appellant's claims which allegedly undermined the jury's finding, we do not find that the great weight and preponderance of the evidence contradicts the verdict. Given the circumstantial evidence linking Appellant to the marijuana, discussed above in our legal sufficiency analysis, compared with Appellant's claims against factual sufficiency, there is factually sufficient evidence upon which the jury could have based its determination. It is the jury's role to believe or disbelieve Appellant's version of events, and this Court holds that the jury could justifiably have come to its conclusion that Appellant was guilty of the charged offense. Issue No. Two is overruled.

We affirm the judgment of the trial court.


DAVID WELLINGTON CHEW, Chief Justice

March 12, 2009

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

(Do Not Publish)